JACKSON & SHARP COMPANY,

*vs.*

THE PHILADELPHIA, WILMINGTON and BALTIMORE
RAILROAD COMPANY.

*New Castle, Sept. T. 1871.*

Although a revocable license such as the grant of a privilege accessary to a permanent business may, by the expenditure of money by the licensee, become a contract which will be enforced by a court of equity, yet this principle must always depend for its application to any par.icular case upon the presumed intent of the parties that the privilege should be commensurate with the business as a *right* in all events, and not merely as a voluntary accommodation.

It is settled that at law a license cannot create or transfer any interest in land. Hence, a mere license affecting lands is, at law, always revocable though granted for a valuable consideration, and though the licensee may have expended money on the faith of it.

This rule is modified in equity by the principle of equitable estoppel, but equitable estoppel proceeds always on the basis of preventing fraud. Its effect is to restrain the exercise of a legal right, and this even a court of equity cannot do unless there has been such conduct as would render the assertion of the legal right a fraud.

The erection of a side track connecting with a railroad, at the expense of plaintiff, and the subsequent expenditure of large sums of money by it in the erection of car-works, from which cars were delivered by means of the side track, *held* not to estop the railroad company from revoking their license to connect the side track with the company's track.

BILL FOR INJUNCTION.—This was a bill in equity to restrain the defendant from taking up a side track which connected their railway with the works of the complainant for the manufacture of railroad cars, in the City of Wilmington.

The case arose out of these circumstances :

Messrs. Jackson & Sharp, the predecessors in business of the Jackson & Sharp Company, erected the car works about the year 1863, adjacent to the railroad track in Wilmington, on the easterly side, a short distance above the crossing at Seventh street. About the time of the erection of the car works, or soon after, but precisely when was not proved, one of the firm, Mr. Jackson, applied to the officers of the railroad Company to connect the car works with the railroad by means of a side track, for greater convenience in the delivery of freight and manufactured cars. This application was acceded to, and after some two or three months' delay the promised connection was effected, deliveries between the railroad and car works being meanwhile made by temporary expedients. Prior to Jackson & Sharp's application, a side track had been laid on the same side of the railroad below Seventh street upon the application of other parties, for the purpose of connecting the road with their works located below that street. To effect the connection with Jackson & Sharp, this side track was extended by the Railroad Company above Seventh street, northwardly as far as the car works, and was there connected with the works by curved tracks extending from the side track into one of the shops. Afterward, in the year 1868, upon the erection by Jackson & Sharp of a paint shop, a similar connection was formed with that shop. These arrangements were completed by the employees of the Railroad Company, under the immediate direction of its officers, and the expense was apportioned between the parties according to the extent of track laid upon their respective lands. The side track and curves continued to be used by Jackson & Sharp and their successors in business, the Jackson & Sharp Company, without interruption or complaint, until the year 1870, when a controversy arose between the parties as to which of them should respond to a claim

made by one Patterson, a workman of the Jackson & Sharp Company, for damage sustained by him from the backing of some cars of the Railroad Company against an old car which he was at the time dismantling on this side track. Patterson sued the Railroad Company for the damage and recovered a judgment, which that Company insisted that the Jackson & Sharp Company ought to pay. The latter Company refusing to do so, the Railroad Company gave notice of their purpose to take up the side track ; whereupon the present bill was filed, and a temporary injunction obtained.

*Bayard* and *S. M. Harrington*, for the complainant.

This is not a case of technical law, but a case for equity, based on social duties and social rights, on the obligations of good conscience and equity.

In 1864 there was a grant by parol of a connection between the railroad and complainant's works. The connection included a right to use the track,—a right then springing from an *executed license*, but which grew to be something more. The license was preceded by expenditures by the complainant to make it beneficial and under that expenditure the license became an agreement and was irrevocable. A license acted upon and causing expenditure stands on the same footing in equity as an executed agreement. *LeFevre vs. LeFevre*, 4 *S. & R.*, 241 ; *Rerick vs. Kern*, 14 *S. & R.*, 267.

To this peculiar business a connection by track is essential, as much so as water to a mill-wheel. It is not like ordinary kinds of business and this was known to the defendant. Cars were to be built as was well known and the track was laid in furtherance of the business. The removal leaves no other or ordinary mode of delivery to the rail road company adequate to the exigencies of the business.

The license cannot be revoked after it has been acted upon and interests created under it. 2 *Am. L. Cas.*, 752,

&c.; *Winter vs. Brockwell*, 8 *East*, 308 ; 2 *Eq. Cas. Abr.* 522 ; *Bond vs. Hopkins*, 1 *Sch & Lef.*, 433 ; *McKellip vs. McIlheney*, 4 *Watts* 317 ; *Swartz vs. Swartz*, 4 *Barr*, 353.

Though a license is operative only between the original parties, yet after it becomes an agreement executed, for an easement, it runs with the land to which it is appurtenant. *Wells vs. Pierce*, 7 *Foster*, 503 ; *Clement vs. Durgin*, 5 *Me.* 9 ; *Am. Bridge vs. Bragg*, 11 *N. H.*, 103 ; *Wilson vs. Chalfant*, 15 *Ohio*, 247 ; *Dyer vs. Sanford*, 9 *Metc.*, 395 ; *Liggins vs. Inge.*, 7 *Bing.*, 682 ; *Addison vs. Hack*, 2 *Gill*, 221 ; *Hall vs. Fisher*, 9 *Barb.* 17.

The doctrine of part-performance of contracts for an interest in land, under the statute of frauds proceeds on the ground of preventing the great injustice of allowing a party to repudiate his engagement after expenditures made on the faith of it ; and the Court will struggle to prevent such injustice.    *Mandy vs. Jolliffe*, 5 *Myln. & Cr.* 177 ; *Pope vs. Hay*, 2 *Vt.*, 560.

But this case is one for the application of the doctrine of equitable estoppel.    *Dutchess of Kingston's case*, 2 *Sm. L. Cas.* 11. 17.

There is no suggestion of any default in the use of the track in the course of the car business, no regulation as to it was violated, the sole complaint is the refusal to pay a judgment of another person against the company,.—a matter wholly collateral.    Yet the complainant is threatened with the only alternative of delivering cars at the freight depot four squares off,— a thing utterly impossible. It is a mere measure of coercion to compel the complainant to indemnify the rail road company against the negligence of its own employees.

*Gordon* and *Smithers*, for the defendant.

1. The claim that there was a *contract* is open to two

objections.   Such contract is not sufficiently alleged and if alleged is not proved.

Such a contract being by parol and only to be taken out of the statute of frauds by part performance should be set forth in clear, certain, unambiguous terms.   1 *Sto. Eq. Jur. secs.* 764, 767.

The original bill contains a suggestion of an express contract and the amendment does not state its terms with the definiteness usual and necessary in such serious transactions.

But if the allegation be sufficient the proof is defective.   The proof should correspond with the allegation, whereas it is at variance with it. The allegation embraces, the person contracting, the time and the subject-matter. The proof fails on every point. Even the person, Mr. Felton, alleged to have made it, denies it, and complainant's proof on this point is too loose to establish anything.   So too on the one side, it is equally vague as to time and place, and flatly denied on the other side.

This case is not within the doctrine of specific performance.   The act of part performance must be unequivocally referable to the agreement and to nothing else.   If referable to anything else it must be refused.   *Wh. & Tud. L. Cas. in Eq.* (512), (522) ; *Phillips vs. Thompson,* 1 *Johns. Ch.* 131 ; *Smith vs Crandall,* 20 *Md.* 499 ; *Ches. & Ohio Canal Co. vs. Young,* 3 *Md.* 488 ; *Stoddard vs. Bowen,* 5 *Md.* 33 ; *Beard vs. Linthicum,* 1 *Md. Ch.* 347.

11. The second claim is that the rights sought to be enforced accrue by reason of *license.*   The nature of the claim is inconsistent with license, which is a permission to do something which would otherwise be unlawful and if extended to lands would be a trespass.

The only color given to the idea of an indefinite privilege or license arises from the consent of the railroad

Company to the laying of the track, and its being laid by its workmen. But this of itself proves nothing. So of the payment by the complainant of one-half of the expense. This was not as a consideration for any right granted, but as the bare cost of the track laid on their land and it was laid by our workmen only because they were skilled. All that was done was consistent with our hypothesis as well as theirs and therefore can alone have no tendency to prove theirs.

III. The third ground was that there was an *estoppel in pais*. As a fundamental principle this exists *causa fraudis*. Not that fraud, hardship or wrong is the consequence but the party claiming must have been deceived or entrapped. It cannot avail one who had his eyes open, though he may suffer hardship because he acts in blind faith in another's honor or generosity. This is a principle recognized in all the cases. *Swartz vs. Swartz, 4 Barr* 353 ; *Martin vs. Angel, 7 Barb.* 409 ; *Miller vs. Auburn & Syracuse R. R. Co.*, 6 *Hill* 61 ; *Mumford vs. Whitney*, 15 *Wend.* 380 ; *Cook vs. Stearns*, 11 *Mass.* 533 ; *Stevens, vs. Stevens*, 11 *Metc.* 251 ; *Woodward vs. Seely* 11 *Ills.* 157 ; *Hayes vs. Richardson*, 1 *Gill & J.* 383.

THE CHANCELLOR :—

The claim made on the part of the complainants to the perpetual use of the side track in controversy as a legal right is based upon two grounds. One of these is, that the right was acquired by contract between their predecessors, Jackson & Sharp, and the Railroad Company :—the other, that even were there, in the first instance, no contract, but only a permissive use of the track under a license, still, that the license, having been acted upon in the expenditure of large sums of money on the faith of its indefinite continuance, has become irrevocable under the doctrine of equitable estoppel.

First, is the question of contract. Here it may be

well to notice, that the point to be inquired of is, not whether upon the application of Jackson & Sharp to the officers of the Railroad Company, a side track was promised and afterward laid, but whether the transaction included a stipulation by the Company, express or implied, for the perpetual use of the side track by Jackson & Sharp and their assigns, as a right appurtenant to the car works. Now, in the view which I take of the facts, it becomes immaterial that the right claimed is an interest in real estate, such that under the statute of Frauds a contract for it is required to be in writing ; for it seems quite certain upon the proofs that there was no contract, either written or verbal, conceding to Jackson & Sharp and their assigns, the perpetual use of this side track as a right, or in any degree restricting the power of the Railroad Company, as owners of the soil, to take it up at their pleasure. The case,—upon the question of express contract,—rests upon the testimony of Mr. Jackson, of the firm of Jackson & Sharp, and Mr. Felton, the then President of the Railroad Company, who represented the parties in the original transactions and between whom the contract, if there were any, must have been effectuated. Both these gentlemen testify with evident candor and caution, and without any material discrepancy in their statements. The result of their testimony is, that at some time early in the commencement of the car work enterprise, after the selection of the site for the works, but whether before or after their erection does not appear, Mr. Jackson on behalf of his firm applied to the officers of the Railroad Company for a connection between the car works and the railroad. The application was acceded to and after some delay the connection was made, deliveries of freight and manufactured cars being meanwhile effected by temporary expedients. Not a word, however, appears to have passed, intended to define the respective rights of the parties in the side track after it should be laid or to prescribe any term or condition of its

continuance; whether, on the one hand, it should remain for the permanent accommodation of the car works as an easement appurtenant to them and beyond the power of the Railroad Company to terminate it, or whether, on the other hand, its continuance was to depend upon the mutual interest and good will of the parties. Mr. Jackson does not state that there was any stipulation for the permanence of the side track,—not even that he understood such to be the purport of the promise to lay the track made in response to his application for it. Mr. Felton, the President of the Railroad Company, under whose direction the connection was made, negatives any such stipulation by stating in substance, that he directed the connection in the usual course of the granting of such accommodations and subject to the general understanding in such cases, that the tracks forming the entire connection should remain under the control of the respective owners of the land on which different portions of it might be laid, without prejudice (as he must be understood to mean) to any right of property on either side. It may then be safely concluded that there was no express contract.

But it is argued that a contract may be implied from the acts of the parties. And the principle sought to be applied at this point of the argument was one announced by C. J. Gibson, in the Pennsylvania cases of *Rerick vs. Kern*, 14 *S. & R.* 267 and *Swartz vs. Swartz*, 4 *Barr* 353, that the grant of a privilege which is accessary to a permanent business is presumed to be commensurate in duration with the business, and although at first but a license and as such revocable, yet that when acted upon in the expenditure of money it becomes a contract for a valuable consideration, to be executed by a Court of Equity as a contract part performed. It will be observed, that this principle must depend, for its application to any particular case, upon the presumed intent of the parties that the privilege granted in such case should be commensurate

with the business to which it might be accessary as a right, *in all events* and not as an arrangement depending upon the will of the parties for its continuance. Ordinarily, such a presumption may be a reasonable one. In the Pennsylvania cases it was clearly so. But after all, this presumption, or to speak more accurately, this inference as to the intent of the parties, is one controlled by the circumstances of the particular case, and may be wholly countervailed by evidence demonstrative that the privilege in question was in fact granted and accepted not as a perpetual, indefeasible right, but as a voluntary accommodation, to abide the good will and mutual interests of the parties. Such, in the present case, is the construction which the evidence obliges me to give to the acts of the parties. As this view is the one decisive of the case, some explanation of the reasons for it is due to counsel.

In the first place, then, I lay out of consideration, as a ground for inferring the concession of a perpetual right to the use of this side track, the great value of such a right to the ownership of the car works. For opposed to this, as a ground for such an inference, is a consideration of hardly less force, which is the interest of the Railroad Company to preserve unimpaired its proprietary control over its road bed and side tracks. And in addition to this, is its obligation as a public corporation, to keep its road, while held for the purposes of the incorporation, unincumbered by private rights or easements of a permanent nature, such as might under any circumstances embarrass its use as a public highway of travel,—an obligation held in the late Pennsylvania cases, to be of so much force as to qualify the doctrine of *Rerick vs. Kern*, that a license is presumed to be commensurate with the business to which it is accessary, so as to leave that doctrine not applicable to licenses by railroad companies affecting lands held by them to corporate uses. *Heyl vs. The Philadelphia, Wilmington & Baltimore Railroad Company*, 5

*Pa., State R.,* 469 ; *Wunderlich vs. The Cumberland Valley Railroad Company,* a late case in the Supreme Court of Pennsylvania, not yet reported.   The principle of these cases does not go so far as to preclude a Railroad corporation from granting private rights or easements in its lands, to be exercised subject to its paramount obligations to the public ; but it offers a strong ground against presuming such grants in the absence of express stipulations, —such as would be proper in order definitely to limit or qualify the rights granted, as rights subordinate to the public obligations of the company.

It is clear then that the relative interests of these parties, the one in acquiring and the other in withholding a perpetual easement in the side track, can afford no legitimate ground of inference as to whether or not the track was laid with an intent to confer such an easement.   That is a question to be determined rather by the transactions between the parties than by their respective interests.

Taking up then, for this purpose, the evidence of the transactions between the parties, I am met at the outset by a fact of irresistible force, disclosed in the testimony of Mr. Felton, the then President of the Railroad Company, by whom the side track was directed to be laid, viz : that the track was laid according to the usual course of granting such accommodations by the Company to business establishments located along its road, it being the general understanding in such cases, that the continuance of the accommodation was to be voluntary on both sides, prejudicing no right of property in the soil, but leaving to the company the absolute control over its own track, with the like control in the owner of the connected works over the track laid upon his land.   And it further appears that it was with this reserved control, tacitly understood by the parties concerned, that the connections similar to the one in question had been made between other works and this same side track, prior to its extension northward of Seventh

street to the car works of Jackson & Sharp,—on which latter point Mr. Felton is corroborated by testimony drawn from the connected works below Seventh street. Against the force of this evidence the testimony of Mr. Jackson, who acted for his firm, proves not only no stipulation with him varying the usage obtaining under other connections of this nature, but not even his own understanding or impression that the Railroad Company intended to concede the perpetual use of the side track as right, or upon any other than the usual tenure of such accommodations, viz : mutual interest and good will. And, then, in addition to all this, is something quite inexplicable, upon the theory of a negotiation looking to a perpetual connection with the Railroad, as a legal right appurtenant to the car works, that is, the omission of Jackson & Sharp to seek a grant in writing, for securing a title so important ; and the omission of the Railroad Company also in the concession of a right so seriously affecting their property, to impose some written conditions touching the maintenance and mode of using the side track. On the whole, gathering the intention of these parties, as we are left to do, from their acts, without any direct expression of it, I can construe this transaction only as a parol license for the permissive use of the side track, and not as a contract for the right, express or implied. Let us then proceed to consider the case in the aspect of a license.

On this branch of the case there are several material points upon which no controversy was raised in the argument. One of these is, that the right claimed for the complainant is to an easement or interest in the land of the Railroad Company, the claim being to the perpetual use of the side track as a right appurtenant to the car works, transmissible with the title to them, and binding the land of the company into whosesoever hands it may come, at least so long as it shall be used for the purposes of a railroad. *Pitkin vs. The Long Island Railroad Com-*

*pany*, 2 *Barb.*, *Ch. R.* 221, is a case very similar. Further, it is agreed that *at law* an estate or interest in land can be created only by deed or grant under seal, or by prescription, or in this country by twenty years' adverse possession or user ; *in equity* such an interest may additionally be acquired by contract, which, however, must, under the Statute of Frauds, be in writing, subject to an exception of the equity arising out of part performance of a verbal contract. Again, it must be admitted that a license or permission to exercise some privilege upon the land of the licensor can create no estate or interest in the land, such as binds the land and is transmissible from the licensee, the utmost effect of a license being to confer a personal privilege, which is not assignable or transmissible, and is revocable at the licensor's pleasure. Nor, does it matter whether the license be by parol or in writing, so long as it remains a mere license, not converted into a conveyance, grant or contract, nor rendered irrevocable by estoppel, as under some circumstances, to be presently noticed, it may be in equity though not at law. Few points have undergone more discussion, and have at length come to be better settled, than the insufficiency of a license at law to create or transfer an interest in land. In England the leading cases are *Fentiman vs. Smith*, 4 *East*, 107 ; *Rex vs. Herndon on the Hill*, 4 *M. & S.*, 565 ; *Hewlins vs. Shippman*, 5 *B & C.* 221, (11 *E. C. L.* 207) ; *Bryan vs. Whistler*, 8 *B. & C.* 288, (15 *E. C. L.* 149) ; *Cocker vs. Cowper*, 1 *C. M. & R.* 418, and *Wood vs. Leadbitter*, 13 *M. &. W.* 838, in which last case the prior course of decisions is very fully reviewed. In this country the same rule was adjudged, as early as 1814, by C. J. Parsons, in *Cook vs. Stevens*, 11 *Mass.* 533. He has been followed in many of the States : *Mumford vs. Whitney*, 15 *Wend.* 384 ; *Foot vs. The N. H. & Northampton Railroad Company*, 23 *Conn.* 214 ; *Foster vs. Browning*, 4 *R. I.* 47 ; *Den. vs. Baldwin*, 1 *Zabriskie*, 390 ; *Hays vs. Richardson*, 1 *G. & J.* 38 ; *Carter vs. Harlan*, 6 *Md.* 20 ; *Bridges vs. Purcell*, 1 *Dev. & Bat.* 492.

But it was earnestly urged that although a license is revocable so long as it is executory and the parties remain in *statu quo*, it ceases to be so, under the doctrine of equitable estoppel, after it has been executed, the licensee having expended money or otherwise involved himself so that he cannot recede without prejudice ; that in this case Jackson & Sharp having made large expenditures in erecting and afterward enlarging their car works upon the faith of their enjoying the continued use of this side track, the Railroad Company are equitably estopped from revoking the license.

Were this a case in a court of law, the answer would be that *at law* a license can under no circumstances become irrevocable by estoppel *when the effect would be to create an interest in land.* The doctrine of equitable estoppel, although largely adopted in courts of law and frequently so applied as to render licenses irrevocable, has been held not to apply to licenses, which, if rendered perpetual, would amount to an easement in lands. The reason is a plain and necessarily conclusive one, viz : that courts of law do not recognize mere equities, such as arise out of an equitable estoppel enforced against the legal owner of lands ; but they deal only with legal estates, such as are acquired through legal forms of conveyance, or their equivalent under the statute of limitations, an adverse possession, of twenty years, or at least by writing under the Statute of Frauds. Hence, a mere license affecting lands is at law always revocable, even though granted for a valuable consideration, as in *Fentiman vs. Smith*, 4 *East* 107, and *Wood vs. Leadbitter*, 3 *M & W.* 833, and although the licensee may have expended money under it, which was a feature of many of the cases before cited.*

It is true, however, that, in this Court, equities in land, though not created by any deed, grant or writing whatever, but springing out of the acts and relations of the

---

* See note at the end of this case.

parties, are largely enforced, and among these a large class are those which arise under the doctrine of equitable estoppel applied to prevent constructive fraud,—as where one having title to land is knowingly silent in the presence of an innocent purchaser from a third person, or where one knowing his title to land silently permits another ignorantly to build on it,—in these, and in like cases, this Court, in order to prevent fraud will raise out of the transaction an equity in favor of the party misled, binding the conscience of the owner and restraining the exercise of his legal rights against such party. No reason is perceived why, in a proper case, the same principle should not in equity restrain the revocation of a privilege affecting the use of land. But it must be carefully observed that this principle of equitable estoppel proceeds upon the ground of *preventing fraud.* Its effect, when applied, is to restrain a party from exercising his legal right, and this even a court of equity cannot do unless there have been on his part some conduct, declaration or improper concealment, misleading an innocent person to his prejudice and rendering the assertion of the legal right as against such person an act of bad faith, amounting to constructive fraud. Moreover, it may be well added that to warrant the interference of the court with the legal right or title of a party, the case relied on to work the estoppel must be clear, beyond doubt; upon the facts. And the more stringently do these rules apply in a ease such as this, where the effect of the estoppel, if allowed, will be to convert what was originally a bare privilege, temporary and revocable, into an easement in the licenssor's land, perpetually binding it and transmissible from the licensee.

It is a fatal infirmity in this branch of the complainant's case that there was nothing in all the communications had between the officers of the Company and Jackson & Sharp, or in the conduct of these officers, to justify Jack-

son & Sharp in assuming that the Company, by granting the accommodation applied for, intended to relinquish any right of property in the soil. It is agreed that no stipulation or promise to that effect was expressed. For reasons before fully stated and which need not be repeated, Jackson & Sharp were not warranted to infer so grave a concession by the Company, as the relinquishment of its proprietary control over its soil, from the bare fact that on their application the side track was laid, nor from its importance as a right appurtenant to the car works ; nor did the general usage connected with the granting of this sort of accommodation by the Railroad Company justify the inference that a perpetual easement in this track was conceded ; but the usage was to the contrary. Looking to all the circumstances of the case, it is my conviction that although the connection of the car works with the railroad was doubtless contemplated on both sides as one to be in fact permanent, yet that no stipulation to that effect was asked or given, or supposed by either party to have been given ; but that the arrangement was tacitly left to rest upon the general understanding with respect to such accommodations, Jackson & Sharp either not anticipating the contingency which has now happened, or trusting to the mutual interest and good will of the parties as a sufficient gurrantee for the permanence of the connection, without securing it as a legal right according to prescribed forms of law. Their disappointment certainly involves them in no little hardship. But hardship is not a ground for equitable relief, except in favor of one who, without any negligence in securing his rights by the appropriate legal modes, has been misled to his prejudice through some fraud or laches of the party against whom the relief is sought, or by such conduct of the latter as renders it an act of bad faith to take advantage of the mistake.

The injunction must be dissolved and the bill dismissed.

NOTE. While the general doctrine of *Wood vs. Leadbitter*, cited in the opinion, that an interest in land cannot pass except by deed, is unquestionable, it seems very doubtful whether the decision itself rightly stands upon that ground. The case concerned the right of the plaintiff, under a ticket of admission to the Doncaster races, to enter upon the land of Lord Eglintoun on which was the race course, the ticket having been sold to the plaintiff under Lord Eglintoun's authority for a consideration paid and expressly entitling the holder to admission during the four days of the races. The decision in that case affirmed the right of Lord Eglintoun to revoke the license without any misconduct of the plaintiff upon the occasion but for causes arising upon previous occasions. Now, assuming that the right to enter under this ticket was an easement in the land the license would undoubtedly be ineffectual to pass it and would form no justification to the holder of the ticket in persisting to enter after notice to desist. But it may well be questioned whether the right given by the ticket was an easement or interest in the land, such as is appurtenant to land and runs with it, but whether it was not rather a personal and temporary privilege, binding only the original parties, Lord Eglintoun and the holder, for the time being, of the ticket ; and though a privilege to be exercised upon the land yet not involving an estate in it requiring a covenant by deed or being within the Statute of Frauds.

It would seems to be just such a privilege or authority as might properly be the subject of a license, and in that view the objection to the recovery of the plaintiff in *Wood vs. Leadbitter* would rest, not upon the invalidity of the ticket considered as the grant of an easement, but upon its revocability as a license. On this point Mr. Baron Alderson held it revocable at the absolute pleasure of Lord Eglintoun even though sold for a consideration because he considered that a license to enter upon land was always revocable except when coupled with an interest in something upon it created by grant or duly created otherwise than by the license itself. This opinion is based mainly upon an early judgment of C. J. Vaughan in *Thomas vs. Sorrel, Vaughan* 351, in which that ground of distinction is put between licenses revocable and licences irrevocable ; —as where a license is given by the owner of land to hunt and take away the deer killed, inasmuch as the right to the deer when killed, becomes vested, as it may become without deed, the license to enter and take it away is irrevocable because coupled with an interest in the deer. But C. J. Vaughan's general statement of the most common and obvious ground on which a license to enter on land becomes irrevocable can hardly be taken as sufficient authority to exclude all other grounds ; and certainly the doctrine of equitable estoppel is as clear a ground for holding irrevocable a license to enter on land temporarily to witness races as is the right to the deer killed on the land under license to enter and kill such deer. Laying out of consideration the Statute of Frauds as not applying to either case,—and if it applies to either it must to both,—the question depends simply upon the revocability of a license ; and there is nothing in the nature of a license to withdraw it from the doctrine of equitable estoppel, no more in a license to enter temporarily upon land

than in license to do anything else, supposing the Statute of Frauds to be out of the way. Indeed the cases put by C. J. Vaughan, of a license to enter, coupled with an interest, must after all be resolved by this doctrine of estoppel ; for the right to enter land and take away deer killed on it, or any other chattel being upon it, is not a general right incident to property in the chattel, but it springs from the authority given by the owner of the soil to kill the deer or to place the chattel there, which authority he cannot in good faith revoke to the prejudice of the party who has acted upon it, supposing there to be in such a case no objection to the validity of the license as passing an interest in the land. And it is upon this principle of equitable estoppel that in the latter cases the irrevocabilty of a license to enter on land is coupled with an interest in something upon it has been placed. *Wood vs. Manley*, 11 *A. & E.* 34 ; *Pierrepont vs. Barnard* 5 *Barb.* 364 ; 2 *Seld.* 279 ; *Nettleton vs. Sikes*, 8 *Metc.* 34. It is therefore at least open to question whether upon principle the case of *Taylor vs. Waters*, 7 *Taunt.* 384, or *Wood vs. Leadbitter* is the better authority.

A very large class of cases are those in which a license so far as it has been executed is held irrevocable so as to charge the licensee with damages for acts done under it. These rest upon the clear and familiar principle, *violenti non fit injuria.* *Clement vs. Durgin*, 5 *Green*, 9 ; *Woodbury vs. Parshley*, 7 *N. H. 237.*.

In a small class of these cases, of which *Winter vs. Brockwell*, 8 *East* 308 and *Liggins vs. Inge*, 7 *Bingh.* 682 are the leading ones, the privilege given by the licensor was that an adjoining landholder might erect upon his own land a structure the effect of which was to obstruct or destroy some incorporeal right previously enjoyed by the licensor as an appurtenance to his own land. In *Winter vs. Brockwell* the right of the licensor obstructed was the access to his premises of light and air which was cut off by the erection of a skylight with the licensor's permission over an area between his house and that of the licensee, the area being the licensee's property. In *Liggins vs. Inge* the right obstructed was to a flow of water to the licensor's mill which he permitted the adjoining land owner to divert by a structure erected upon his own land. *Addison vs. Hack*, 2 *Gill* 221, is precisely like *Liggins vs. Inge.* The principle of all these cases is that the license passed no estate or interest in the licensor's land but was simply a relinquishment of a right or easement on his part affecting the land of another, and that the relinquishment being consummated by the erection of the permitted structure on the licensee's land, the licensor's previous easement necessarily became extinct and could not be restored by any revocation of the license, but only by a removal of the structure so as to restore matters to their original condition ; but this the licensee in such case cannot be compelled to do since the structure is one erected upon his own land with the licensee's consent.

But where the effect of the structure erected upon the licensee's land is not merely to destroy some incorporeal right of the licensor, such as the passage of

Note.

light or water over land of the licensee, but the effect is to create a continuing easement on the land of the licensor; as if the structure, instead of diverting a flow of water from the licensor's land backs it upon him; in that case, the best authorities hold that, inasmuch as the effect is not to extinguish but to create an easement, a parol license is revocable even to the extent of compelling the removal of the obnoxious structure, though erected upon the licensee's land. Such are *Seidensparger vs Speer*, 17 *Me.* 123; *Carleton vs. Redington*, 1 *Foster*, 291; and *Bridges vs. Purcell*, 1 *Dev. & Bat.* 492. Another large class of cases are those of a license, coupled with an interest, as it is termed, that is, a license to enter upon or do some act upon land of the licensor, the continuance of which is necessary to the possession or enjoyment of a right or interest which the licensor has created : as in the example commonly put of a license given to hunt on one's land and have the deer killed. The gift of the deer when killed, which may be by parol, carries the privilege of entering to take it away, which privilege cannot be revoked; and so the right to enter generally on land of another for the purpose of removing one's chattels placed there by his consent is held to be irrevocable until after a reasonable time for its exercise. This class of cases rests upon the distinction taken by *C. J. Vaughn*, in *Thomas vs. Sorrell, Vaughan* 330; 1 *Levinz* 217; *Wood vs. Manley*, 11 *A, & E.* 34; *Patrick vs. Colerick*, 3 *M. & W.* 483; *Hewitt vs. Isham*, 7 *Exch.* 77; *Nettleton vs. Sikes*, 8 *Metc.* 34; *Heath vs. Randall*, 4 *Cush.* 5; *Pierrepont vs. Barnard*, 5 *Barb. S. C.* 364; 2 *Selden*, 279. The principle has been extended by a liberal construction of the law of fixtures, so as to restrain the owner of soil who has licensed the erection upon it of a building or other permanent structure from preventing its removal by a revocation of the license. Of this class are *Prince vs. Case*, 10 *Conn.* 375; *Wells vs. Bannister* 4 *Mass.* 514; *Doty vs. Gorham*, 5 *Pick.* 487; *Fletcher vs. Com. Ins. Co.* 18 *Pick.* 419; *Osgood vs. Howard*, 6 *Greenleaf*, 452; *Barnes vs. Barnes*, 6 *Vt.* 388; *White's appeal*, 36 *Pa. St.*, 134; *Vanness vs. Pacaid*, 2 *Peters* 137; *Russell vs. Richards*, 10 *Me.*, 429; 11 *Id.* 371; *Hilborn vs. Brown*, 12 *Me.* 162.

But the principle of these cases that a parol licensee may acquire by license an interest in chattels or temporary structures on land of another distinct from an easement in the land and carrying as incident to it the right irrevocable to enter for the purpose of removing such chattels or structure has not been extended to structures of a permanent nature erected on the land of the licensor, such as a bridge, abutment or dam, so as to vest an interest in the structure apart from the land carrying a right not revocable to enter for repairing or rebuilding. In Maine and New Hampshire such a license has been held irrevocable so far as to create a personal privilege between the original parties, but not to create an estate or interest in the land assignable by the licensee or binding a purchaser from the licensor. *Rutte vs. Kelly*, 1 *Me.* 117 and *Ameriscoggin Bridge vs. Bragg*, 11 *N. H.* 102, qualified by the subsequent cases of *Seidenspayer vs. Spear*, 17 *Me.* 123 and *Carlton vs. Redington*, 1 *Foster* 291. Under the best authorities, however, such a license

is at all times revocable even between the original parties. The principle is that the right to erect and hold such a structure on another's land must be created by grant in order to draw after it the right to enter and repair or maintain it. *Cook vs. Stern,* 11 *Mass.* 537 ; *Mumford vs. Whitney,* 15 *Wend.* 380.

This review covers substantially, all the decisions at law which hold a license, acted under, to become irrevocable. It will be seen that all recognize the principle that a license does not by being acted under become irrevocable *at law,* if the effect would be to create an interest in lands, however questionable some attempts may appear to relieve cases of special hardship from the operation of this principle.