## William Kamphouse *et al.*

### *v.*

## John Gaffner.

1. Boundaries—*courses and distances controlled by fixed objects.* Where boundaries are given with reference to fixed and known objects, they control courses and distances.

2. Evidence—*as to location of premises referred to as a boundary.* Where premises occupied by certain persons are referred to in a lease as a boundary of the premises leased, it is proper to admit evidence showing the location of premises so referred to, for the purpose of explaining the circumstances under which the lease was made, or of applying it to its proper subject matter, or of raising and explaining a latent ambiguity.

3. Construction—*duty of court and not of jury.* An instruction which tells the jury that in locating lands described in a lease, they should consider all the words used in the lease having reference to the description or location of the land, and that words denoting merely bearings or directions must yield to words referring to fixed objects or monuments, is objectionable, in not construing the lease and informing the jury the precise words of description which control, instead of allowing them to determine the fact for themselves.

4. License—*to work mines can only be granted by deed.* Every license that authorizes such acts as are not only required to be performed upon the land, but which gives some usufruct of the land itself, is property—a grant of an incorporeal hereditament, and must be created and transferred by deed.

5. Same—*by parol good until revoked—not transferable.* A parol license to mine on land is a protection against an action of trespass for acts done under it before revocation, but it is revocable at the will of the licensor, and can not be transferred to another.

6. A subsequent conveyance or leasing of the premises amounts to a revocation of license, whether by deed or parol, unless such license is coupled with an interest, and executed.

7. Former decision — *limited or overruled.* The case of *Russell* v. *Hubbard,* 59 Ill. 335, must either be limited to cases of party walls, or be considered overruled.

Appeal from the Circuit Court of Winnebago county.

Mr. David Sheean, and Mr. William Lathrop, for the appellants.

Mr. J. M. Bailey, Mr. J. I. Neff, and Mr. J. W. Lake, for the appellee.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was an action of trespass *quare clausum*, by appellants against appellee and John Gaffner, Jr., who died pending the litigation in the court below. The suit was commenced in the Jo Daviess circuit court, whence it was removed, by change of venue, on the petition of appellee, to the Winnebago circuit court. Trial was had in that court, resulting in a judgment in favor of appellee, from which this appeal is prosecuted.

Appellants' claim is, that appellee and his co-defendant entered certain premises to which they were entitled to possession, and mined therein and carried away large quantities of lead ore. The premises are in what is now known as the " Sand Prairie " or New California diggings, situated near the Mississippi river, in the township of Rice, in Jo Daviess county. The mining territory at this place consists of a series of bluffs, the general course of which is from north to south, rising abruptly to a considerable height, from the margin of a slough that puts back from the river. The usual mode of mining there is by running levels or drifts, horizontally, from the slough into the bluffs. The ore is found in crevices or openings in the rocks, running back from the base of the bluffs.

There is no dispute in regard to the fee simple title to the premises involved in the controversy. It was in one John Kamphouse, who died intestate in 1854, leaving, him surviving, a widow and two children, who were his only heirs at law. The widow subsequently married one Lenfers, and is still living. One of the children, a daughter, intermarried with one Henke. The other child, when about eighteen months old, died, leaving its mother, Mrs. Lenfers, and its sister, Mrs. Henke, its only heirs at law. Before 1870, Mrs. Henke and her husband both died intestate, leaving their infant daughter, Anna Caroline Henke, their sole surviving heir.

Appellants claim under two leases, by virtue of which, they insist, they are entitled to the possession, for mining purposes, of all the territory of the width of the frontage on the bluff, embraced by their leases, extending thence due east across the

Kamphouse lands. Appellee claims in part under a lease, and in part under a parol license to mine. He denies that appellants are entitled to run due east from their frontage on the bluff, but insists they are only entitled to follow any crevice or mining range, starting from their frontage on the bluff, across the Kamphouse land. He also insists that he is entitled to follow any crevice or mining range, starting from his own frontage on the bluff, although it shall cross a due east and west line extending from that part of appellants' frontage on the bluff nearest his possession, across the Kamphouse land.

There was evidence tending to show that appellee, in following what he claims to be a crevice or mineral range, starting from a point on the bluff entirely beyond the frontage embraced in either of the leases under which appellants claim, crossed and went beyond a due east and west line extending from appellants' frontage nearest his possession, across the Kamphouse land, and there took out a large amount of ore.

The first question, in determining whether there was error in giving and refusing instructions, in the respects indicated by appellants' objections, is, what is the proper construction of the words descriptive of the premises leased, as found in the leases under which appellants claim?

The first lease is dated August 12, 1871, and it purports to lease " all the interest of said party of the first part (which is one-half) in all that part of the lands of the estate of the late John Kamphouse, deceased, in the township of Rice, between John Gaffner's sand level, and the range he is working now. Said claim is seventy-five feet wide, and is known as the old Bardwell & Robinson range. The ground hereby leased fronts on the slough on the west half of the north-east quarter of section 28, township 27 north, of range 1 east, of the fourth principal meridian, and shall run from thence east on all the lands of said Kamphouse estate."

The second lease is dated February 17, 1872, and it purports to lease " all the interest of said party of the first part (which is one-half) in all that part of the lands of the estate of the late John Kamphouse, deceased, in the township of Rice, north

of the leased mining claim to Kamphouse and Roddweig, as per lease dated August 12, 1871, (known as the old Bardwell & Robinson range.) and adjoining John Gaffner's mining claim. Said claim has been vacant for mining heretofore, and is a strip six feet ten inches, according to an old survey, laying between said Kamphouse and Roddweig claim and the claim of John Gaffner. The ground hereby leased fronts on the slough on the west half of the north-east quarter of section 28, township 27 north, of range 1 east, of the fourth principal meridian, and shall run from thence east on all the lands of the Kamphouse estate."

It is argued by appellants that the word " east," as it occurs in the language quoted from the leases, was an absolute term of description, and that the leases gave no other terms of description by which the boundaries of the premises could be discovered.

We are unable to yield our assent to this construction. *Brant* v. *Ogden*, 1 Johns. 158, referred to as sustaining it, has, in our opinion, no application. There, the term northerly, which was held to mean due north, was alone used, without any object to direct its inclination to the east or to the west, while here, the boundaries are given with reference to previous leases, and it is, therefore, impossible it could have been intended any other territory was to be included than that within those boundaries. The rule is universal, where boundaries are given with reference to fixed and known objects, they control courses and distances. 4 Kent's Com. (8th Ed.) 519; 2 Washb. on Real Estate, (2d Ed.) 673.

The lease to appellee bears date on the 10th day of June, 1871, and it embraces " all the interest of said party of the first part, being the undivided half in the Sand Level range, north of Burrichter & Harris' mining claim, and of two other ranges north of William Kamphouse's mining claim, on land of the estate of the late John Kamphouse deceased, in the township of Rice. The ground hereby leased fronts on the slough, on the west half of the north-east quarter of section 28, township 27 north, of range 1 east, of the fourth principal meridian,

and shall run from thence east on all the lands of said Kamp-
house estate."

Here, as in the leases to appellants, it is evident the words
" and shall run from thence east," etc., are controlled by the
previous words designating the location.

Evidence was also given showing the location and course
of the range that appellee was working on the 12th day of
August, 1871, and to which reference is made as a boundary by
the lease to appellants of that date.

There can be no question of the competency of this and all
other evidence introduced for the purpose of explaining the
circumstances under which the leases were executed, *Stanley* v.
*Green*, 12 Cal. 162, *Hildebrand* v. *Fogle*, 20 Ohio 147, 157;
or of applying the leases to their proper subject matter, *Brad-
ley* v. *The St. I. and G. St. P. Co.* 13 Peters, 97; or of raising
and explaining a latent ambiguity, Chitty on Cont. (11 Am.
Ed.) 149. See, also, 1 Greenleaf's Evidence §§ 295–8, and
notes; 2 Washb. on Real Property, (2d Ed.) 673.

The second instruction, given at the instance of appellee,
was as follows: "The jury, in ascertaining and locating the
lands described in the two leases from Caroline Lenfers to
plaintiffs, should consider all the words used in said leases
having reference to the description or location of said lands;
and words denoting merely bearings or directions must in all
cases yield to words referring to fixed monuments or objects
upon or in the land itself, when conflicting therewith."

This is objectionable in not construing the leases and in-
forming the jury of the precise words of description which
control, instead of allowing them to determine the fact for
themselves. "It is," says Parsons, in his work on Contracts,
vol. 2, p. 492 (6th Ed.), "the court  *  *  that determines
the construction of a contract. They do not state the rules
and principles of law by which the jury are to be bound in
construing the language which the parties have used, and then
direct the jury to apply them, at their discretion, to the ques-
tion of construction; nor do they refer to these rules unless
they think proper to do so for the purpose of illustrating and

explaining their own decision. But they give to the jury, as matter of law, what the legal construction of the contract is, and this the jury are bound absolutely to take."

The objection taken to appellee's third instruction is, that it ignores, as an element of right, the possession of appellants. This is untenable. There is no evidence that appellants were in the actual possession of the *locus in quo*, when the alleged trespasses were committed. The rule applicable in such cases is thus stated in 1 Chitty's Pleadings, 193: "With respect to the plaintiff's interest in the property affected, he must, at the time the injury was committed, have had an actual or a constructive possession, and also a general or qualified *property* therein." Not having the actual possession, it was not pretended appellants had the constructive possession, and any general or qualified property therein, otherwise than by virtue of their leases. We can not, therefore, think it probable that the use of the word "title," which, according to Blackstone, "is the means whereby the owner of lands hath just possession of his property," (2 Coms., Sharswood's Ed. 194,) could have misled the jury in the respect claimed. They would, we think, naturally and properly understand it as referring to the interests claimed by virtue of the leases. Nor do we think the suggestion that the instruction leaves the jury to dispose of the rights of the parties without restriction, well founded. They are simply left to ascertain, from the evidence, whether the range or crevice out of which the mineral was taken, was within the territory covered by the leases to appellants, which was proper. This was a question of fact which an inspection of the leases, alone, would not determine, but which depended, as well, upon other evidence, giving the location of the premises described in the leases, with reference to the place whence the mineral in controversy was taken.

The eighth, ninth and tenth of appellee's instructions are faulty in the same respect as his second. The court, instead of construing the leases, leaves the jury to do so under its instructions. The seventh instruction is faulty in assuming that the words "crevice" and "range" are synonymous. This was

a question of fact, to be determined by the jury from the evidence.

The objection on account of the refusal of the court to give, as asked, the third and fourth of appellants' instructions, can not be sustained. In them the court is asked to instruct the jury, that the word "east," in the leases, means "due east," and controls the other words of description. This, under the views we have before expressed, is not allowable, and the instructions were properly refused.

The fourth instruction, given at the instance of appellee, was as follows:

"If the jury believe, from the evidence, that before the plaintiffs acquired any rights in their mining claim in question, the defendant obtained from the owner of the land out of which the mineral in question was taken, a license to mine thereon for lead, and in mining to follow his range across the Kamphouse lands, and entered upon said lands under said license, and discovered the crevice or range out of which said mineral was taken, and opened said crevice or range, and run a level or drift along the same to the vicinity of where said mineral was taken out, expending in so doing a large sum of money, the defendant, provided it was his range, thereby acquired a right as against both the owners of said lands and their lessees, to continue said level or drift along said crevice or range, and to take therefrom the mineral in question; and, even if the jury believe from the evidence that the plaintiffs afterward obtained from the owners of said land a mining lease covering said crevice or range, said lease could not revoke or annul the defendant's rights to said crevice or range, or give the plaintiffs any rights thereon as against the defendant."

The license here claimed had its origin some years before either of the leases was executed, and is not merely to perform some act upon the land, but to take a portion of that which, in legal contemplation, is the land itself. The law, as laid down in Bainbridge on Mines, at page 251, and supported by numerous English decisions, referred to in the notes, is, "that

a beneficial privilege in land, as, a license to work mines, can only be granted by deed." The same author adds, on page 252: "Every license, therefore, that authorizes such acts as not only require to be performed *upon* the land, but which gives some *usufruct of the land itself*, is properly a grant of an incorporeal hereditament, and must be created and transferred by deed." See, also, ib. at p. 129, and Collier on Mines, (46 Law Library) 17. There is no controversy that such a license is a protection against an action of trespass for acts done under it before revocation; nor is it, on the other hand, controverted that such a license is revocable at the will of the licensor, nor that a subsequent conveyance, or leasing of the premises, works a revocation of the license, when the licensee has not expended money or bestowed labor on the subject of the license; but it is claimed, when this has been done, the license is irrevocable, or, at least, that it can not be revoked until the licensee shall have been compensated for his money or labor.

It is said, in Bainbridge on Mines, p. 252–3, "A parol license, limited in its scope, as above stated,"—that is, so that it amounts only to authorize such an act as excuses a trespass, and which regards rather the act itself than its connection with the land—" when fully executed and not depending on continuous acts, can not be countermanded. But as long as it remains executory it may be revoked, and it can not be transferred to another. For such a license is only personal, and lasts only so long as the land belongs to the grantor, or so long as he permits its exercise. Any expenditure incurred, or valuable consideration given, by the grantee, will not avail to make the license less revocable." And this is quoted from the opinion of Mr. Baron Alderson, in *Wood* v. *Leadbitter*, 13 Meeson and Welsby, 538. In *Desloge et al.* v. *Pearce et al.* 38 Missouri, 588, the precise question under consideration arose and was fully discussed. The court, among other things, said: "A mere license, unaccompanied with any vested interest in the real estate, created by deed or other writing, and independent of any title acquired by grant, prescription, or

adverse possession and claim for the period of the Statute of Limitations, must be deemed to be, in its own nature, countermandable, and essentially revocable at the will of the owner of the fee. It can give no irrevocable right to hold possession of the realty, and to continue working the mines indefinitely, and against the will of the owner of the land." In *Woodward* v. *Seely*, 11 Ill. 157, this court, after elaborate argument by able counsel, held, a license coupled with an interest in land must be in writing, and that a mere license, whether by deed or parol, is always revocable at the will of the licensor, unless coupled with an interest and executed, then it is irrevocable.

The following, among other cases, will be found to sustain the same rule: *Cook* v. *Stearns*, 11 Mass. 535; *Morse* v. *Copeland*, 2 Gray, 302; *Hatfield* v. *The Central R. R. Co.* 5 Dutcher, 571; *Eggleston* v. *The New York R. R. Co.* 35 *Barb.* 162; *Houston* v. *Saffer*, 46 New Hampshire, 505; *Foster* v. *Browning*, 4 Rhode Island, 47.

*Russell* v. *Hubbard*, 59 Ill. 335, is referred to as announcing a different rule. That case must either be limited to cases of party walls or be considered as overruled. On mature consideration we are unwilling to announce the doctrine, that notwithstanding the prohibition of our Statute of Frauds to the contrary, an interest in land which can not be terminated by revocation, may be acquired by parol license, which a court of law will recognize and protect. We still preserve the distinctions between law and equity, however, and to what extent a court of equity might enforce *specific performance*, or grant relief on account of the peculiar hardship resulting from a revocation by a licensor, is another question, and one that we can not now properly consider.

The cases referred to as having been decided by the Supreme Court of Iowa, in some respects, are commendable for the equitable view they take of the question; but when applied to a court in which the distinctions between law and equity are preserved, they are contrary to the current of authority, and we do not feel at liberty to follow the rule they indicate.

We are, therefore, of opinion the court erred in giving the instruction, and the judgment must be reversed and the cause remanded.

*Judgment reversed.*