Argued May 4, decided June 14, rehearing denied October 4, 1910.

## SHAW *v.* PROFFITT.

[109 Pac. 584; 110 Pac. 1092.]

WORDS AND PHRASES—"RIGHT."

1. The word "right" denotes, among other things, "property," "interest," "power," "prerogative," "immunity," and "privilege"; and in law is most frequently applied to property in its restricted sense. As an enforceable legal right it means, that which one has a legal right to do.

WATERS AND WATER COURSES — WATER RIGHTS — ESTABLISHMENT — PLEADING.

2. An allegation of a "right" to maintain a ditch admits of an easement as well as a bare parol license.

EASEMENTS—"RIGHT OF WAY."

3. A "right of way" is an easement of perpetual use, a charge or burden upon the land of one for the benefit of another.

WATERS AND WATER COURSES—RIGHT OF WAY FOR IRRIGATION DITCH.

4. A letter acknowledging a request for a right of way for an irrigation ditch and stating "Go ahead. The more ditches you build, the better it will suit me"—granted a right of way, and not a mere revocable license.

LICENSES—CONSIDERATION.

5. An easement or irrevocable license may be supported by a benefit accruing to the licensor as well as by payment to him.

WATERS AND WATER COURSES — EASEMENT — DITCHES — CONSENT OF OWNERS.

6. Land owned by one's wife and daughter became subject to his grant of a right of way for an irrigation ditch, though they did not assent thereto, where he controlled the land and afterwards acquired title thereto.

WATERS AND WATER COURSES—CONTRACTS—EQUITABLE RIGHTS.

7. The construction of an irrigation ditch for one-fourth of a mile under a parol contract is sufficient part performance to give the licensee an

equitable right to complete and maintain the ditch according to the contract.

WATERS AND WATER COURSES—IRRIGATION DITCHES—RIGHTS OF LAND-OWNERS.

8. The owners of land through which an irrigation ditch was maintained could not take water therefrom nor interfere with the appropriator's use of the water, even if the ditch was maintained under a revocable license.

WATERS AND WATER COURSES—INJUNCTION—INTERFERENCE WITH IRRIGATION DITCH.

9. Injunction lies to prevent unlawful interference with the water rights of the owner of an irrigation ditch by the owners of the land through which it extends.

LICENSES—REVOCATION.

10. A license, implied from silence or acquisition with knowledge of the expenditures, is not made irrevocable by expenditures made in permanent improvements in reliance thereon; but an express license, under such circumstances, is irrevocable.

EASEMENTS—MANNER OF CREATION.

11. While ordinarily an easement can be created only by writing under seal, it may be created by adverse user, by estoppel, or part performance of a parol agreement.

LICENSES—EASEMENTS.

12. An express oral license, becoming irrevocable by execution, by expenditures in permanent improvements in reliance thereon, inuring to the benefit of the licensor, if relating to the use or occupation of real estate, becomes an easement.

LICENSES—REVOCATION—FRAUD—ESTOPPEL.

13. The licensor's attempted revocation of the express license, which has been executed by expenditures in permanent improvements by the licensee to the knowledge of the licensor, is a fraud, against which equity will relieve by estoppel.

WATERS AND WATER COURSES—LICENSE—REVOCATION.

14. The license: "I have just * * found your letter * * asking for right of way through my land in P. Would say go ahead. The more ditches you build, the better it will suit me"—is express authority to construct the ditch, contemplating a permanent right of way, so as to make it irrevocable after permanent improvements in reliance thereon.

WATERS AND WATER COURSES—DEFINITENESS OF LICENSE.

15. Though a license to construct a ditch on the licensor's land is indefinite as to location and extent, it becomes definite in such respects when located and constructed.

LICENSES—REVOCATION—GRANTEE OF LICENSOR.

16. A license, irrevocable as to the licensor, is binding on his grantee taking with notice.

WATERS AND WATER COURSES—REVOCATION OF LICENSE—GRANTEE OF LICENSOR—NOTICE.

17. A grantee of land, knowing of a ditch through it and of another's claim to an irrevocable license therefor, has notice of his rights.

Sig. 7

ESTOPPEL—PLEADING BY PLAINTIFF.

18. The answer, in an action to have interference with plaintiff's license enjoined, having contained only admissions and denials, it was not necessary for plaintiff to plead estoppel; and, had the answer raised the question of the statute of frauds, or that the license was in parol, estoppel would not have to be pleaded by reply, but could be raised by demurrer, the complaint having set up the facts necessary to make the license irrevocable.

WATERS AND WATER COURSES—REVOCATION OF LICENSE—ESTOPPEL—SUBSEQUENT ACQUIRED TITLE OF LICENSOR.

19. Defendant, acting as owner of land, having granted plaintiff a license to construct a ditch through it, and having thereafter acquired the title, while recognizing the right of plaintiff, who, supposing the land belonged to defendant, had at great expense partly constructed the ditch, is estopped to revoke the license, the same as though he had been the owner when he granted it.

MR. JUSTICE KING dissenting.

From Union:  JOHN W. KNOWLES, Judge.

This is a suit by John Shaw against T. N. Proffitt and Joe Carter enjoining defendants from in any manner interfering with a certain canal or ditch built by plaintiff across the lands of defendants, under an irrevocable license.

From a decree in favor of plaintiff, defendants have appealed.                                          AFFIRMED.

For appellants there was a brief over the names of *Messrs. Butcher, Clifford & Correll*, with an oral argument by *Mr. Morton D. Clifford*.

For respondent there was a brief over the names of *Messrs. Finn & Lomax*, with an oral argument by *Mr. Leroy Lomax*.

MR. JUSTICE SLATER delivered the opinion of the court.

MR. JUSTICE KING dissenting.

Defendant has appealed from a decree declaring plaintiff to be the owner of a certain canal or irrigating ditch built by him across defendant's lands, under an irrevocable license, the right to the uninterrupted use and enjoyment of the same for the purpose of conveying water to his lands for irrigation, and perpetually enjoining defend-

ant from interfering with such ditches. Plaintiff alleged
that he obtained from Proffitt and his predecessors in
interest the right, consent, permission, and license to
excavate, use, and maintain a main ditch, called his
"upper ditch," which, as originally constructed, was $4\frac{1}{2}$
feet in width at the top and from $1\frac{1}{2}$ to 3 feet in depth
and to use a certain canyon or gulch, leading from his
main ditch on the west side of defendant's land easterly
to a lateral or part of the "lower ditch," first excavated
by him, and leading to the S. W. $\frac{1}{4}$ of section 33, an iso-
lated portion of his lands. The decree was in plaintiff's
favor as to the upper ditch, but against him as to the
right to use the said canyon or gulch.

The facts appear to be that in 1895 plaintiff owned in
Powder River Valley, Union County, about 1,400 acres of
dry, arid land, including the N. $\frac{1}{2}$ of section 32 (except
the S. E. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$), the S. W. $\frac{1}{4}$ of section 33
and the E. $\frac{1}{2}$ and N. E. $\frac{1}{4}$ of N. W. $\frac{1}{4}$ of section
31, all in township 5 S., range 39 E., of Willamette
Meridian. This land was covered with sagebrush
and bunch grass, and without the aid of artificial
irrigation would produce little or no crops, but with
sufficient water would bring forth abundant crops
of hay and grain. The water supply available for
irrigating these lands was Wolf Creek, some 12 miles
distant from the N. $\frac{1}{2}$ of section 32, and Anthony Creek,
about 6 or 8 miles further off. To bring this water to the
plaintiff's lands, it was necessary to cross sections 5 and
6 in township 6 south, lying immediately south of the
plaintiff's lands. At that time these sections were open,
uninclosed lands, apparently a part of the public domain.
Plaintiff, not knowing to whom they belonged, if any one
besides the State or the United States, for the purpose of
bringing this water to his lands, commenced and com-
pleted in the fall of 1895 the excavation of about $2\frac{1}{2}$
miles of ditch, which began upon his own land and

extended southerly approximately through the middle of section 32, and about to the center of section 5, intending later on to extend the ditch to Wolf Creek, the source of supply. The following spring he began at Wolf Creek, and constructed the ditch towards his place, crossing the south line of section 6, township 6 S., at about the middle of the S. W. ¼ of the S. E. ¼ thereof, and continuing northerly through the E. ½ of that section; thence in a northeasterly direction to the junction with the piece of ditch first constructed. Because of an erroneous survey, establishing the grade, water would not flow through the part first dug. He therefore dug a new ditch upon a lower grade (which, with its laterals, is known and designated in the record as plaintiff's "lower ditch"), beginning about three-eighths of a mile north of the center of section 5, and running northerly in the same general direction a short distance to the east of the abandoned ditch. This ditch branched near the center of section 32, one branch extending southeasterly to the S. W. ¼ of section 33, and the other branch extending northerly onto section 32. But, when completed, it was found that the northerly branch was too low to carry water into a large reservoir, constructed by plaintiff at the northwest corner of section 32 for storing water for use after the natural flow had ceased. This could be remedied only by going up the ditch about 2½ or 3 miles onto the N. W. ¼ of the S. E. ¼ of section 6, and making a diversion from the main ditch at a point near the south line of that 40-acre tract, and meandering thence westerly about a quarter of a mile; thence northeasterly through section 6, and along the section line between sections 5 and 6 and 31 and 32, to plaintiff's reservoir, the general course of the ditch being upon higher land and around the heads of dry gulches, which extended downward easterly through the defendant's lands. At and prior to the time plaintiff dug these ditches he was uninformed as to the owner of these lands,

which were wild and uncultivated, and of the same arid character as plaintiff's lands. However, before excavating the ditch now in controversy, which is called plaintiff's "upper ditch," he learned that one Jesse Failing, then living at Pendleton, some 100 miles distant, was the owner, to whom, in August, 1899, plaintiff wrote a letter, asking him for a right of way for an irrigating ditch across his lands. This letter was not introduced in evidence, but, the nonproduction thereof being explained to the court's satisfaction, oral testimony of its contents was received. Under date of August 31st Failing answered as follows: "I have just returned after an absence of a month and found your letter of the 19th inst., asking for a right of way through my land in Powder River Valley. Would say, go ahead, the more ditches you build the better it will suit me." At that time Failing owned, and had owned since 1884, all of section 5, and the E. ½ of section 6. His wife, M. C. Failing, owned the S. W. ¼ of section 6, all in township 6 south, and Edith Failing, his daughter, owned the S ½ of section 32, in township 5 south. Plaintiff received this letter, and thereafter, in the fall of that year, or the spring of 1900, began the excavation of his upper ditch, but dug only about one-quarter of a mile, beginning on the N. W. ¼ of S. E. ¼, section 6, near the middle of the southern boundary thereof, and extended the ditch westerly and southwesterly onto the S. W. ¼ of that section. He then ceased digging for the time, allowing the water to flow from the end of the ditch so extended down a natural depression or dry gulch, until it reached the lower level of plaintiff's former ditch, through which it passed onto his land, where it was used for irrigation purposes. This system was employed without further change until in 1902, in the early part of which year, Jesse Failing contracted to sell these lands, including the lands in his wife's and daughter's names, to James Russell and the defendant jointly, who were engaged in the

butcher business and desired the land for pasturing beef cattle. Before purchasing, these parties visited the land, saw plaintiff's ditches thereon, but made no inquiry of him as to the extent of his rights. On April 25, 1902, Mrs. Failing and her daughter conveyed their lands to Jesse Failing, and on the same date the latter conveyed his land, and that conveyed to him by his wife and daughter, to Russell and defendant Proffitt. In the month of May following, Russell, who seems to have arranged for the purchase of these lands for himself and defendant, and generally to have been managing their joint business enterprises, visited the premises and rode over the land, in company with plaintiff, for the purpose of viewing the lines between their respective lands. At that time plaintiff explained to Russell the character and purpose of the ditches, and the failure of the "lower ditch" to accomplish the purpose desired; that he wished to complete the "upper ditch," so that it would be high enough to deliver the water into the reservoir at the northwest corner of section 32; that he had a right of way from Failing, but had not had time to dig the ditch. Plaintiff testifies that Russell said in response: "I don't see that it will make any difference any more than the higher up the gulch it is the better it will make the grass." Russell admits he had such a conversation with defendant. The result of that conversation, however, does not appear, nor could Russell remember whether he afterwards had any conversation with plaintiff. On cross-examination he testifies that, when plaintiff said he had a right of way from Failing, he understood reference was made to the old ditches; that plaintiff wished permission to change the location from the lower to the upper ditch, and would abandon the lower ditches, which witness and his co-tenant could use for irrigating their own land, by making a reservoir a mile or a mile and a half back of their place distinct and separate from plaintiff's system. The feasibility of this

plan was suggested to Russell by one Chenault at that time in the employ of Russell and Proffitt, and who was present and took part in the conversation. On redirect examination Russell states that he does not remember whether in the conversation he had with plaintiff in May, plaintiff made the statement that he had a right of way from Failing, but says:

"He (plaintiff) told me later on he had a right from Failing, and he may have told me at that time. I don't know."

From this evidence it may be plainly inferred that Russell had two conversations with plaintiff about his right to dig the ditch across defendant's lands, and that probably one of these conversations was subsequent to the time Russell conveyed to Proffitt the substance of his conversation with plaintiff. The defendant makes no denial that he had a conversation with his co-tenant, Russell, concerning plaintiff's ditches. Immediately after having purchased the land in 1902, Russell and Proffitt caused the same to be fenced, and thereafter used it for pasturing beef cattle, keeping from 200 to 300 head thereon. On June 8, 1904, Russell sold and conveyed to defendant his interest in the land, which thereafter was occupied and used by defendant for the same purpose. Plaintiff, relying upon his supposed right of way from Failing and the assent of Russell, if not also that of defendant, completed in 1902 his upper ditch to his reservoir, and thereafter conveyed water through the same to his reservoir and lands, irrigating and cultivating something over 600 acres, and at the time this suit was brought his land was highly improved and productive.

It is admitted by the defendant that annually for four or five years prior to 1908, he cut plaintiff's ditch and took water therefrom for his own use without the consent and against the objections of plaintiff. About the month of July, 1908, when plaintiff's tenant was irrigating his crop

on the N. W. ¼ of section 33, by taking the water out of the main ditch, on the west line of section 32, and allowing it to run down a dry gulch or canyon to the plaintiff's lower ditch, thence through the easterly branch thereof to said land, the defendant caused his tenant to take all the water flowing down through the said natural water course and to turn it into a reservoir on his own lands, about the center of the S. ½ of section 32, which he had constructed, and used for conserving a supply of water for the use of his stock when the water should cease flowing through plaintiff's ditch in the dry season. Although defendant testifies that he at different times cut plaintiff's main ditch, allowing the water to flow down on his own lands, not for the purpose of using the water, but for the purpose of disputing the plaintiff's right to maintain the ditch, we are satisfied the evidence clearly establishes, even by defendant's own witnesses, that he and Russell, while they were joint tenants, and the defendant afterwards, depended upon the water in plaintiff's main ditch to supply the stock feeding in his inclosure, and that there was not during the dry season of the year sufficient natural water on the defendant's lands to supply any considerable part of the needs of his stock, and that before Russell conveyed to the defendant they caused to be constructed on their own land two reservoirs, which from time to time, without plaintiff's consent, they filled with water by cutting plaintiff's ditch, and allowing the water to flow down the otherwise dry gulches to such reservoirs, and that they did this for the purpose of being sure of a supply of drinking water for their stock, after the natural flow of water in the irrigating ditches should cease. Prior to 1905, plaintiff procured his supply of water solely from Wolf Creek, but his rights thereto were subject to the prior rights of others, and hence his supply frequently failed as early as July. In that year, still relying upon his supposed

right to maintain his main ditch on the defendant's lands, he extended his main ditch from Wolf Creek on to Anthony Creek, a distance of some eight miles, where he procured an additional supply, and thereafter he had water in his ditches sufficient for his needs, until as late as August 25th. Plaintiff's ditch upon defendant's land was not so inclosed as to prevent access thereto by the cattle, which, so long as water was flowing in the ditch, were at liberty to drink therefrom. This must necessarily be of considerable benefit to defendant's pasture lands, and he has profited thereby. We are satisfied such benefit was contemplated by Failing when writing to plaintiff, and by defendant and Russell, when they fenced their land and permitted plaintiff to proceed with the completion of his ditch.

1. It is strenuously urged by defendant's counsel that, under the pleadings in this case, plaintiff stands on a bare parol license, which he claims to have obtained from the defendant and his predecessors in interest and that, therefore, plaintiff is precluded from obtaining the full effect of his evidence. We do not agree with such restricted interpretation of the language found in the complaint. It is averred that plaintiff obtained the "right" as well as the "consent, permission and license of defendant and his predecessors." The word "right" denotes, among other things, "property," "interest," "power," "prerogative," "immunity," and "privilege," and in law is most frequently applied to property in its restricted sense. As an enforceable legal right, it means that which one has a legal right to do. 7 Words & Phrases, 6220.

2. It is therefore sufficiently comprehensive in meaning to admit evidence of an easement, or any right legal or equitable, greater than a mere, naked license. It is claimed, however, that there is no evidence other than what would be sufficient to sustain proof of the mere parol license from Jesse Failing as to his own lands, which

license, not being based on any consideration paid by the licensee, is revocable by the licensor at his pleasure, and was, in fact, revoked by his conveyance of the legal title to Russell and Proffitt: *Stevens* v. *Stevens,* 11 Metc. (Mass.) 251 (45 Am. Dec. 203) ; *Kamphouse* v. *Gaffner,* 73 Ill. 453; *Eckerson* v. *Crippen,* 110 N. Y. 585 (18 N. E. 443: 1 L. R. A. 487). This would be true, it is claimed, even though plaintiff may have expended money and labor in executing the license: *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906: 58 Pac. 524) ; *Ewing* v. *Rhea,* 37 Or. 583, 586 (62 Pac. 790: 52 L. R. A. 140: 82 Am. St. Rep. 783).

It is further claimed that no license whatever was shown to have been acquired from either Mrs. Failing or her daughter, neither of whom had any knowledge, until this suit was brought, of the receipt of plaintiff's letter by Mr. Failing, of the answer returned by him, or that plaintiff had, in fact dug any ditches on their land. It was held in the earlier Oregon cases, following the doctrine of the leading case of *Rerick* v. *Kern,* 14 Serg. & R. (Pa.) 267 (16 Am. Dec. 497), that a license is irrevocable after the expenditure of money, or the erection of improvements in reliance thereon by the licensee: *Curtis* v. *La Grande Hydraulic Water Co.,* 20 Or. 34 (23 Pac. 808: 25 Pac. 378: 10 L. R. A. 484) ; *McBroom* v. *Thompson,* 25 Or. 559 (37 Pac. 57: 42 Am. St. Rep. 806) ; *Garrett* v. *Bishop,* 27 Or. 349 (41 Pac. 10) ; *Bowman* v. *Bowman,* 35 Or. 279 (57 Pac. 546). Later cases, however, qualify this rule, by declaring that the license relied on must be an express agreement, and not a mere passive acquiescence, amounting at most to an implied license, without consideration or benefit inuring to the licensee, and that such passive acquiescence will not raise an estoppel, and that the license may be revoked, if not allowed to stand until the statute of limitations has constituted a bar: *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906: 58 Pac. 524) ; *Hallock* v. *Suitor,* 37 Or. 9 (60 Pac. 384) ;

*Ewing* v. *Rhea,* 37 Or. 583 (62 Pac. 790: 52 L. R. A. 140: 82 Am. St. Rep. 783), overruling on this point: *Curtis* v. *La Grande Hydraulic Water Co.,* 20 Or. 34 (23 Pac. 808: 25 Pac. 378: 10 L. R. A.- 484) ; *McPhee* v. *Kelsey,* 44 Or. 193 (74 Pac. 401: 75 Pac. 713) ; *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142). It was held in *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906: 58 Pac. 524), although not necessary to the decision of the case, that a license to be irrevocable must result from some consideration paid by the licensee, or some benefit accruing to the licensor. This case was cited with approval in *Ewing* v. *Rhea,* 37 Or. 583 (62 Pac. 790: 52 L. R. A. 140: 82 Am. St. Rep. 783), and in *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142). In at least two of the case holding licenses to be irrevocable the decision seems to have been based mainly on the fact that a benefit by way of payment or other advantage had accrued to the licensor: *Baldock* v. *Atwood,* 21 Or. 73 (26 Pac. 1058) ; *McPhee* v. *Kelsey,* 44 Or. 193 (74 Pac. 401: 75 Pac. 713).

3. In the case at bar, however, the correspondence between plaintiff and Failing, antedating the construction of the main ditch, amounts to something more than a mere parol license. It will be remembered that plaintiff requested of Failing "a right of way" for an irrigating ditch across his lands. A right of way is an easement of perpetual use, a charge or burden upon the land of one for the benefit of another. 34 Cyc. 1767; *Blake* v. *Boye,* 38 Colo. 55 (88 Pac. 470: 8 L. R. A. (N. S.) 418).

4. That is what the parties must have had in contemplation, and understood, when they used the term in dealing with each other. Failing, by his answer, clearly conveyed to plaintiff his intention to grant him a right of way, although nothing was expressly said about a deed or conveyance, for he uses the term "right of way" in his letter, and assents to plaintiff's request by

telling him to "Go ahead. The more ditches you build, the better it will suit me." We think, also, that his letter shows that Failing made this promise, contemplating that he would receive sufficient benefit from the construction of the ditch to justify the granting of the right of way without payment or other consideration. He anticipated that his land would be benefited by the construction of the ditches, and that was the consideration for which he impliedly promised to grant a right of way; for, when testifying for the plaintiff, he says that he considered the ditch proposed to be dug a benefit to the land, and on cross-examination, when asked by defendant's counsel whether Shaw paid him any consideration for going across his land with the ditch, he answered: "No; if there had been any consideration, it would have been the other way I think."

5. The consideration necessary to support a contract to grant an easement or an irrevocable license is not confined to something paid by the licensee or grantee, but includes some benefit accruing to the licensor: *Baldock* v. *Atwood*, 21 Or. 73 (26 Pac. 1058); *McPhee* v. *Kelsey*, 44 Or. 193 (74 Pac. 401: 75 Pac. 713); *Lavery* v. *Arnold* 36 Or. 84 (57 Pac. 906: 58 Pac. 524).

In his argument defendant's counsel has closely followed the reasoning of Mr. Farnham in his valuable work on Waters and Water Rights. We find at page 2335, volume 3, thereof, this statement of the law:

"If the expenditures are made for the benefit of or at the request of the licensor, there is a sufficient consideration to form a contract, so that, if it is partly executed, equity will compel its complete performance. And, if the improvement is for the benefit of the licensor, or if it is undertaken at his solicitation, so that the licensee can be regarded as having made the expenditure at his request, there will be sufficient consideration to uphold the contract."

In support of this declaration, the learned author cites
the facts and the law as held in *Southwestern R. Co.* v.
*Mitchell*, 69 Ga. 114. In that case a landowner gave a
parol license to another to erect a milldam on and over-
flow a part of his land, in view of benefiting his own
estate, and it was held that, after the licensee had
expended large sums of money in the execution of the
license, and had built a dam and mill, useless without the
right to flow the land, the licensor could not revoke and
annul the license at will or without any remuneration.
See, also, *Adams* v. *Patrick*, 30 Vt. 516, and *Hodgson* v.
*Jeffries*, 52 Ind. 334, and other cases cited in footnote
number five to the above quotation from Mr. Farnham.
The case from Indiana, last above cited, appears to be
specially in point to the case at bar. A parol license was
given by a landowner to the owner of adjoining land to
construct and perpetually use a ditch over the former's
land to a natural stream in consideration of the benefits
to his land from drainage, upon the faith of which the
adjoining owner constructed such ditch, and a system of
lateral ditches on his own land leading thereto, and used
the same for many years with the knowledge and con-
sent of the licensor. It was held that the license was
irrevocable by the grantee of the licensor, although
unforeseen injuries resulted from the construction of
the ditch to the land of the servient estate.

6. It is claimed that Mrs. Failing and her daughter,
Edith, were not bound by the agreement of Mr. Failing
to give or grant a right of way, and therefore the license
did not attach to the land of either. Perhaps they were
not personally bound, but it is not material to consider
them at all. This agreement was binding on Mr. Failing,
who was dealing with the land standing in the names of
his wife and daughter, as owner of such lands. At the
time of the negotiations, plaintiff understood Mr. Failing
was the owner of all the lands, and the latter testifies that

when he used the words "my land," in the letter addressed to plaintiff, he meant all the land then standing in the names of his wife and daughter, as well as that standing in his own name, because he had been looking after and controlling all of the land, and he afterwards dealt with it as his own by contracting to sell, and did sell, their land as his own, but, before consummating such sale, the title thereto was vested absolutely in him, and it then became subject to his personal contract with plaintiff. Before the title became vested in defendant Proffitt and his co-tenant, Russell, plaintiff had dug about one-fourth of a mile of his main ditch, mostly on the land which Failing then owned, but partly on the land then standing in his wife's name.

7. If we should consider the agreement between Failing and plaintiff to be a parol contract merely, then there was sufficient part performance to vest in plaintiff an equitable right, entitling him to proceed with the completion of the ditch, and to maintain it for the uses contemplated in the original agreement.

8. The attitude of Russell and defendant Proffitt towards plaintiff, and his right to construct and maintain the ditch, while they held the title to the land in common, and of Proffitt, after he became the sole owner, tends to confirm plaintiff's rights as we have adjudged them. At no time did they attempt to deny his right to construct the ditch or to maintain and use it, nor did they, by any notice to cease flowing water through it, or not to enter upon defendant's premises to repair such ditch, attempt to revoke what defendant now insists was a mere license, although it is now argued that it was revoked by the conveyance of the title to them. On the contrary, the evidence shows that plaintiff was requested by the defendant and his employees to repair the ditch, and at one time assistance was rendered by one of defendant's employees to plaintiff in repairing the ditch,

although it is said that this was done without defendant's
knowledge, but it was afterwards brought to his notice.
The only fair inference that can be drawn from the
defendant's acts, regarding the use and maintenance of
this ditch, is that he and his co-tenant, Russell, were at
all times willing that plaintiff should spend his money
and labor in digging this ditch, and in bringing water
therein some sixteen or seventeen miles to and across
their lands, but assumed the right to take water there-
from, and to interrupt plaintiff's use thereof, wherever
and at whatever time they might wish, and apply it to
their own use, upon their own land, even for a time to
the taking of all. There is no law or equitable rule justi-
fying such summary action by the defendant, even had
the plaintiff only a revocable license. Plaintiff's title
to the water flowing in the ditch could not be, and was
not, disputed by the defendant, although the right to
maintain the ditch might have been, for the water had
been segregated by plaintiff from the general supply,
was impounded in his ditch, and was intended to be
appropriated to his own use. It was under his control
and had become his property. 2 Farnham, Waters and
Water Rights, § 462, p. 1568.

9. The defendant's answer admits the cutting of the
ditch and the taking of the water, but denies that any
such acts were wrongful or without right. There is no
plea or evidence of a previous revocation, and the acts
of the defendant in thus appropriating plaintiff's prop-
erty was clearly a trespass, which the defendant expressly
manifests his intention to continue, and should therefore
be enjoined from the continuance of such invasion. How-
ever, we are clearly of the opinion that the correspond-
ence between plaintiff and defendant's predecessors in
interest amounts to an agreement in writing, based on
sufficient consideration to grant a right of way for the
ditch; that it was executed by plaintiff, without objection

being made by defendant; and that the latter has received the consideration contemplated in the making of the agreement, and cannot now, under any view of the case, rightfully object to the maintenance and use of the ditch.

The decree is, therefore affirmed.          AFFIRMED.

MR. JUSTICE KING delivered the following dissenting opinion.

I am unable to agree with the conclusion reached in the foregoing opinion, and am not in accord with all of the views expressed. I therefore feel impelled to give in part at least my reasons therefor.

The complaint pleads a license only, and no other claim by either of the parties has been made in their briefs or at the oral argument. I recognize the possibility of the eminent counsel for the respective parties being mistaken in this respect, but I am of the opinion that their position is not open to serious doubt. The only averment in the complaint bearing on this feature is "that the plaintiff obtained from the defendant T. N. Proffitt and his predecessors in interest * * the right, consent, and permission and license to build and construct the said main ditch, and to use the said canyon or gulch as a part of his said irrigating ditch, and to build, construct, and maintain the said lateral ditch leading from said canyon. * *" Not only from the fact that it has been so treated and recognized throughout the trial by the plaintiff and his counsel that only a license was intended to be pleaded, but from the language used it is clear that the words, "right, consent and permission and license," are intended as merely synonymous terms, each defining the other. I find nothing in the definition of the word "right" even if it were standing alone, to justify the broad meaning applied thereto in deciding this case. The standard dictionaries treat the word "right," when used in this manner, as synonymous with "authority," "privilege,"

"license," etc.   True, an easement includes a right, but a
right does not necessarily include an easement.   An ease-
ment is a permanent interest in another's land, with the
right at all times to enter and enjoy the same; and, save
under exceptional circumstances, such, for example, as
adverse possession for the requisite period, or as in
*Morse* v. *Whitcomb,* 54 Or. 412 (102 Pac. 788: 103 Pac.
775), must be founded upon a grant by deed or writing,
or by prescription: *Emerson* v. *Bergin,* 76 Cal. 197 (18
Pac. 264) ; *Stokes* v. *Maxson,* 113 Iowa 122 (84 N. W.
949: 86 Am. St. Rep. 367).   As stated by the court in
*Forbes* v. *Balenseifer,* 74 Ill. 183, 185, "a license, unlike
an easement, is not an interest in the land, but only a
privilege to go upon the land for a specified purpose, but
is revocable at the will of the owner, whilst an easement
is irrevocable"—citing Washburn, Eas. 23.   But, as in
effect held in the case of *Baldwin* v. *Taylor,* 166 Pa. 509
(31 Atl. 250), a license is distinguished from an easement
which must be created by grant or prescription in the
fact that the latter always implies an interest in the land
upon which it is imposed, while a dispensation or license
passes no interest, nor does it alter or transfer prop-
erty in anything but only makes an action lawful which
without it would have been unlawful.

But, assuming it was the purpose of the language
quoted from the complaint to assert that a grant of per-
petual easement was intended to be given, the letter
offered in evidence is insufficient for that purpose, and
even if it were admissible, subject to supplemental parol
proof in a suit for specific performance, the pleadings are
insufficient therefor.   It is not claimed in the opinion
that a grant was actually made, but that the letters
exchanged amounted to a written agreement to make
such grant.   Nor is it assumed that this is a suit for
specific performance of a contract, and until the grant
is made, either in writing or as a result of a decree for

specific performance, plaintiff cannot successfully rely thereon. He has at no time been in the actual possession of the ditch. The ditch is on the lands of defendant, making plaintiff's possession constructive only. 28 Am. & Eng. Ency. Law (2 ed.) 239. How, then, can it be said on the perpetual easement theory that plaintiff may permanently enjoin defendant from interfering with his possession? For he had been not only ousted from his use, or constructive possession, by the one through whose lands the ditch extends, but his right of constructive possession stands upon a mere, indefinite written authority, requiring, for completion, parol proof. A perpetual injunction under such circumstances will not lie; no authority has been cited to such effect, nor do I think a decision that so holds will be found, unless it be the one here under consideration.

Plaintiff's case must stand or fall upon a license, upon which he has acted under such circumstances as will estop defendant from questioning his rights. This estoppel plaintiff had an opportunity to plead in his reply, but did not do so, contenting himself with a mere denial of the affirmative allegations of the answer. Under no rule, as I view it, can plaintiff avail himself of any transaction or doing between him and defendant, without pleading such facts as may constitute an estoppel, and the rule in this state that an estoppel of such character to be available must be pleaded is too well settled to need discussion or citation of authorities. Since, therefore, the issues presented are not broad enough to enable plaintiff to rely upon the right to a permanent easement over the premises, a consideration of the facts discussed in the opinion is unnecessary. I know of no reason why we should suspend in this particular case, even though it were a discretionary matter (and it certainly is not), the well-settled rules of pleading, for defendant was undoubtedly justified in relying on these rules, and was,

accordingly, entitled to notice of such issue. The decree in the case of *McPhee* v. *Kelsey,* 44 Or. 193 (74 Pac. 401 : 75 Pac. 713), was vacated by this court to enable the defendant to offer proof, not on an issue not pleaded or relied upon by either party, as here, but on a possible ambiguous averment, upon which the suit finally turned. See *McPhee* v. *Kelsey,* 45 Or. 290 (78 Pac. 224). I think therefore, that even should it be assumed that the statement of the facts is in accord with the weight of evidence, as to which I express no opinion, the authorities relied upon in the majority decision are not in point.

Again, the written permission here urged came, at the time it was given, from only a part of the owners of the property. The fact that Failing may have had charge of all the lands or may thereafter have become possessed of the title thereto is of no avail, unless on the theory of estoppel, which, as stated, is not within the issues. The so-called contract or writings are not nearly so complete as was the agreement, and the twenty-five years' subsequent acquiesence of the parties thereto presented by the record for the consideration of this court, and held insufficient, in *Beers* v. *Sharpe,* 44 Or. 386 (75 Pac. 717). In that case an examination of the records and briefs will disclose that estoppel was both pleaded and established. The result on the main point therein (whether a subsequent, separate, and distinct appropriation of surplus water, by means of a dam and canal leading therefrom, in which all were tenants in common, could be made) is in conflict with the views and the law announced in *McPhee* v. *Kelsey,* 44 Or. 193 (74 Pac. 401 : 75 Pac. 713), as well as inconsistent with subsequent adjudications thereon, among which is *Ison* v. *Sturgill,* 57 Or. 109 (109 Pac. 579), but I find the law announced therein on the above point unshaken by any later decision, save by the majority opinion herein.

I deem it unnecessary at this time further to present

my reasons for dissenting, as in my opinion the foregoing
are adequate to justify a reversal of the decree appealed
from.

--------

Decided October 4, 1910.

ON PETITION FOR REHEARING.

[110 Pac. 1092.]

MR. JUSTICE EAKIN delivered the opinion of the court.

MR. JUSTICE KING dissenting.

10. The principal contention of defendant relates to the
revocability of the license.    There is a great conflict in
the authorities upon this question, which are thoroughly
reviewed in notes to *Stoner* v. *Zucker,* 148 Cal. 516 (83
Pac. 808: 113 Am. St. Rep. 301), in 7 Am. & Eng. Ann.
Cas. 706, to *Gyra* v. *Windler,* 40 Colo. 366 (91 Pac. 36),
in 13 Am. & Eng. Ann. Cas. 843, and to *Pifer* v. *Brown,*
43 W. Va. 412 (27 S. E. 399), in 49 L. R. A. 497.    In the
note to the first case mentioned, the author, at page 706
of 7 Am. & Eng. Ann. Cas., says:

"The cases are practically agreed that on strict com-
mon-law principles a bare license is revocable at the will
of the licensor, even though executed; but it is held by a
very respectable line of authorities, as in the reported
case, that on principles of equity the revocation of a
license after the licensor has stood by and permitted the
licensee to incur considerable expense on the faith of the
license would amount to a constructive fraud, working
an estoppel in the licensee's favor."

This court long ago adopted the rule that a parol license
cannot be revoked after it has been executed by the
licensee, who, in reliance thereon, has expended money
in permanent valuable improvements.    In *Curtis* v. *La
Grande  Water  Co.,* 20 Or. 34, 44 (23 Pac. 808, 810),
Justice LORD, who wrote the principal opinion, says:

"An executed license is treated like a parol agreement
in equity; it will not allow the statute to be used as a

cover for fraud; it will not permit advantage to be taken
of the form of the consent, although not within the
statute of frauds, after large expenditures of money or
labor have been invested in permanent improvements
upon the land, in good faith, upon the reliance reposed
in such consent. To allow one to revoke his consent,
when it was given or had the effect to influence the con-
duct of another and cause him to make large investments,
would operate as a fraud, and warrant the interference
of equity to prevent it, under the doctrine of equitable
estoppel. The ground of the jurisdiction is to prevent
injustice or fraud."

He there held that the executed license estopped the
licensor and his grantee with notice, but that, in the
change of the location of the dam and pipe line, the
plaintiff's silence or acquiescence did not estop her, or
constitute an irrevocable license, and he affirmed the
decree of the lower court. But, on rehearing, it was held
by Mr. Justice STRAHAN that, because of plaintiff's silence
and acquiescence while the expenditures were being made
it amounted to an implied license and was irrevocable,
and the decree was modified accordingly. But this part
of that decision was expressly overruled in *Ewing* v.
*Rhea,* 37 Or. 583, 587 (62 Pac. 790: 52 L. R. A. 140: 82
Am. St. Rep. 783), where it was held by Mr. Justice
MOORE that a mere naked license by acquiescence is not
rendered irrevocable by the expenditure of money on
the strength of such acquiescence or implied license. The
same justice, in *Miser* v. *O'Shea,* 37 Or. 231, 237 (62
Pac. 491, 493: 82 Am. St. Rep. 751), states the rule thus:

"This court has adopted the rule that if a party, rely-
ing upon the faith of an express parol agreement, make
permanent valuable improvements upon an estate, which
may inure to the advantage of the owner thereof, the
license upon the faith of which the improvements are
made cannot be revoked to the prejudice of the party
executing it."

And again, in *Ewing* v. *Rhea,* 37 Or. 583, 587 (62 Pac. 790: 52 L. R. A. 140: 82 Am. St. Rep. 783), it is said "that if a party has paid a consideration therefor, or been encouraged by any participation in a common enterprise, or induced by a definite oral agreement to expend money in making permanent valuable improvements, the parol license upon the faith of which he has acted in executing it cannot be revoked to his prejudice." To the same effect are *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906: 58 Pac. 524); *Hallock* v. *Suitor,* 37 Or. 9, 13 (60 Pac. 384); *Brown* v. *Gold Coin Mining Co.,* 48 Or. 277, 284 (86 Pac. 361); *Sumpter Ry. Co.* v. *Gardner,* 49 Or. 412 (90 Pac. 499); *Falls City Lumber Co.* v. *Watkins,* 53 Or. 212 (99 Pac. 884). These cases seem to determine the law in this state upon this question to the effect that a license implied from silence or acquiescence with knowledge of the expenditures is not made irrevocable by expenditures made in permanent improvements in reliance thereon, but an express license, under such circumstances, is irrevocable; and we think this is supported by the weight of authority: *Ruthven* v. *Farmers' Co-op. Creamery Co.,* 140 Iowa 570 (118 N. W. 915); *Gyra* v. *Windler,* 40 Colo. 366 (91 Pac. 36).

11. A distinction is made by counsel between a license and an easement. The latter, he contends, can only be created by solemn writing. The rule is that an easement can only be created by writing under seal, but there are exceptions well recognized in equity. It may be created by adverse user, by estoppel, or part performance of a parol agreement.

12. An express oral license may be revocable at any time before it is executed, for it creates no interest in the land; but if executed—that is, if expenditures be made in permanent improvements in reliance thereon, inuring to the benefit of the licensor—then it becomes irrevocable,

and if it relates to the use or occupation of real estate it becomes an easement. This is recognized in many cases. In *Curtis* v. *La Grande Water Co.*, 20 Or. 34, 44 (23 Pac. 808, 810), Mr. Justice LORD, quotes with approval from *Jackson* v. *Railroad. Co.*, 4 Del. Ch. 180, which, in laying stress upon the necessity for a clear case to make a license irrevocable, says that the effect will be to convert what was originally a bare privilege into an easement in the licensor's land, perpetually binding it and transmissible from the licensee. The author of the note at 49 L. R. A. 497, says: "The moment it [the license] ceases to be so revocable it creates an interest in the land, and rises to the dignity of an estate or an easement." See, also, *Pope* v. *Henry,* 24 Vt. 560; *Snowden* v. *Wilas,* 19 Ind. 10 (81 Am. Dec. 370) ; *Metcalf* v. *Hart,* 3 Wyo. 513, 546 (27 Pac. 900: 31 Pac. 407: 31 Am. St. Rep. 122).

13. The licensee's right to relief is on the ground of fraud, against which equity will always relieve by estoppel on account of the fraud or by specific performance of an oral agreement partly performed to prevent fraud, whether the fraud be actual or constructive, intentional or nonintentional: *Metcalf* v. *Hart,* 3 Wyo. 513, 547 (27 Pac. 900: 31 Pac. 407: 31 Am. St. Rep. 122). See note to *Hall* v. *Chaffee,* 13 Vt. *157, by Mr. Justice REDFIELD. In *Metcalf* v. *Hart,* 3 Wyo. 513, 547 (27 Pac. 900: 31 Pac. 407: 31 Am. St. Rep. 122), it is said:

"Cases may arise and have arisen where a license to occupy land has been intended and understood as a mere personal favor to the licensee to give him a place to live, or to occupy for some other beneficial purpose not transmissible, but revocable at will. Then expenditures would naturally be made accordingly. In other cases the granting of the license has been in terms an assurance of permanent possession. It is evident that the same rule cannot apply to both classes of cases. The revocation of the license even after expenditures made in consequence of it, in the one case is a right, in the other a fraud. No

general rule can be made as to the revocability of such licenses after such expenditures. Each case stands upon its own circumstances. When we have traveled through the mass of decisions, cloudy and conflicting at times, and have arrived at the principle that equity will relieve where there is fraud, actual or constructive, we have arrived at a principle in regard to which there is no conflict. And courts of equity * * are very generally agreed that the revocation of a parol license to permanently occupy and improve realty after any considerable expense has been incurred on the faith of such license, under circumstances such that the parties cannot be placed in *statu quo,* is either actual or constructive fraud."

Much of this language is quoted evidently with approval as a conclusion to the note in 7 Am. & Eng. Ann. Cas. 717. See, also, *Mason* v. *Hill,* 27 E. C. L. 15; *Liggins* v. *Inge,* 20 E. C. L. 304, and *Lowe* v. *Adams,* 2 Ch. (Eng.) 598, in which a doubt is expressed as to whether *Wood* v. *Leadbitter,* 13 Meeson & Welsby's Rep. 538, which seems to hold to the contrary and is frequently quoted as expressing the rule in England, is good law.

14. The license in this case, as gathered from the letter of Failing, which is: "I have just * * found your letter of the 19th inst., asking for right of way through my land in Powder River Valley. Would say go ahead. The more ditches you build, the better it will suit me"— is express authority to construct the ditch, and, in view of all the circumstances, did not contemplate a temporary affair, but a permanent right of way.

15. It is indefinite as to the location and extent of the ditch; but, when they were located and constructed, both became definite. The whole ditch was constructed at great expense, viz., $6,000 or $7,000, to convey water for irrigation upon plaintiff's land, and the part upon defendant's lands is only a small part thereof; the ditch being about sixteen miles long. A permanent way appears to have been the intention of the parties, and

such intention must control: *Brown* v. *Honeyfield*, 139 Iowa 414 (116 N. W. 731) ; *Pifer* v. *Brown*, 43 W. Va. 412 (27 S. E. 399: 49 L. R. A. 497, 509).

16. Again, it is urged that, even though the license is irrevocable as to the licensor, it is not so as to his grantee. But the authorities that hold the license irrevocable also hold that it is binding upon the grantee of the licensor who took with notice. 3 Pom. Eq. Jur. § 1295; *Bush* v. *Sullivan*, 3 G. Greene (Iowa) 344 (54 Am. Dec. 506) ; *Beatty* v. *Gregory*, 17 Iowa 109 (85 Am. Dec. 546) ; *Snowden* v. *Wilas*, 19 Ind. 10 (81 Am. Dec. 370) ; *Simons* v. *Morehouse*, 88 Ind. 391; *Metcalf* v. *Hart*, 3 Wyo. 513, 548 (27 Pac. 900: 31 Pac. 407: 31 Am. St. Rep. 122). Counsel for defendant, in his brief, concedes this, saying:

"We have no doubt that, under the liberal rule established by these cases, the promise of Failing would be enforced by almost any court of equity against Failing, and also against any successor to Failing who took with either actual or constructive notice of the burden existing on the estate in favor of Shaw."

And as to notice Pomeroy says:

"If a purchaser, or incumbrancer, dealing concerning property of which the record title appears to be complete and perfect, has information of extraneous facts or matters *in pais* sufficient to put him on inquiry * * respecting some outstanding interest, claim, or right, which is not the subject of record, and he omits to make inquiry, he will be charged with constructive notice of all the facts which he might have learned by means of a due and reasonable inquiry." 2 Pomeroy, Eq. § 613. See, also, *Petrain* v. *Kiernan*, 23 Or. 455, 457 (32 Pac. 158.)

This principle is applied in case of a water ditch in *McDougal* v. *Lane*, 39 Or. 212, 214 (64 Pac. 864.) In *German Savings & Loan Society* v. *Gordon*, 54 Or. 147, 156 (102 Pac. 736, 739), Mr. Chief Justice MOORE, in discussing the same principle, says:

"We are unable to discover any valid reason for a distinction in the rules of law applicable to servitudes

depending upon whether they are continuous or discontinuous, except in the matter of the greater conspicuity which the former usually affords. An artificial ditch in which water regularly flows must necessarily be a constant reminder of all beholders of the changed condition of the surface of the earth, whereby the dominant tenement is drained or irrigated. * * A discontinuous *quasi* easement, when evidenced in a similar substantial manner, ought to pass by implied grant as an appurtenant to the dominant tenement, when the latter is severed by a conveyance thereof."

And in 23 Am. & Eng. Enc. Law (2 ed.) 499, it is said:

"It is generally held that the possession of itself operates as constructive notice, and consequently that it is immaterial that the purchaser was actually ignorant that the land was adversely held, especially where he could have easily acquired knowledge of the fact, but neglected to visit the premises."

17. Defendant testified that when he and Russell purchased the land there was a ditch coming onto the land at the south and across the land, and onto Shaw's place on this land, it was our understanding through Mr. Williams (who negotiated the purchase for Russell and Proffitt) the north; and Mr. Russell testifies: "When we bought that there was no writing granted by Mr. Failing, and he was selling it to us. He said Mr. Shaw had no legal right through that place"—showing clearly that, at the time of the purchase, they knew of Shaw's claim and had talked it over. This was sufficient to put defendant upon inquiry, which constitutes notice, and, taken in connection with their recognition of the ditch thereafter, tends strongly to establish that the defendant was chargeable with knowledge of Shaw's rights: *Carter* v. *City of Portland,* 4 Or. 339. They thereafter recognized Shaw's rights in permitting him to complete the upper ditch, regarding which Russell testified:

"As I understood he would vacate the lower ditch, and I had talked with Mr. Chenault about getting water and

putting water down there, and of course we spoke of those ditches, that we could use them for laterals ourselves."

18. Defendant further contends that plaintiff cannot rely upon an estoppel, because none is pleaded. A cursory examination of the pleadings will show that no occasion has arisen requiring plaintiff to plead it. The complaint alleges the license, and the facts necessary to constitute it an irrevocable license. The answer in relation thereto contains only admissions and denials; and, there being no affirmative allegation, he is asserting nothing that he ought not to be heard to allege. If by the answer he had raised the question of the statute of frauds, or that the license was in parol, the estoppel might have been raised by demurrer, as the facts are set out in the complaint. This was so held in *Oregonian Ry.* v. *Oregon R. & N. Co.* (C. C.) 22 Fed. 245, 249 (10 Sawy. 464, 471), where it is said that, "if this fact did not already appear in the complaint, the plaintiff could not have the benefit of the estoppel, unless he set it up in a replication; and that is the way in which the point is generally made in the pleadings. But in this case the matter which operates as an estoppel—the contract of leasing—is set forth in the complaint. In such case the defendant [plaintiff] may claim the benefit of the estoppel by demurrer to the plea, which contains the defense, of a want of corporate existence or power." There are many authorities to this effect. See *Adams* v. *Patrick*, 30 Vt. 516, and 8 Pl. & Pr. 9, and cases there cited.

19. The allegations of the complaint disclose an irrevocable license, and proof thereof establishes plaintiff's case. If the question of estoppel arose upon the trial, then plaintiff could establish it by the evidence; but it seems to have been raised in this court for the first time.

Counsel also contend that Failing's license to Shaw to construct the ditch cannot affect or bind the land then owned by his wife and daughter, and relies upon *Houston*

v. *Zahm*, 44 Or. 610 (76 Pac. 641: 65 L. R. A. 799), as conclusive upon that question. But that case is readily distinguishable from the one before us. In the Zahm case the contract contemplated that the University would purchase certain land and should thereafter open and maintain a public street across the same. This is a provision for an easement upon the land of the University, when acquired, to be constructed and maintained at the expense of the owner. No expense or act by the grantee is involved. Second, there was no dominant estate. Only an easement in gross was contemplated. Third, the easement did not create a covenant running with the land; that is, it was an agreement concerning land but not an estate in the land.

In the present case Failing was acting as owner, and personally authorized Shaw, who supposed him to be the owner, to construct the ditch on the Failing land, not an easement in gross, but an irrigation ditch appurtenant to his land. This was partly executed by Shaw in good faith at great expense, and thereafter, while recognizing Shaw's right, Failing acquiring the title, and equity will interpose an estoppel as though he held the title at the time the license was granted, in which case the after-acquired title will inure to the benefit of the licensee: 11 Am. & Eng. Enc. Law (2 ed.) 403. In the Zahm case the street was to be erected, at the owner's expense, on land thereafter to be acquired by it, which was not done, and estoppel cannot be invoked. In 26 Am. & Eng. Enc. Law (2 ed.) 114, it is said it will not defeat an action for specific performance by a vendor that he did not have title to the property in question at the time the contract was made, provided he will be able to convey at the time of the rendition of the decree. To the same effect is Waterman, Spec. Perf. §409. And the converse of that statement is elementary. If the vendor is able to perform at the time of the suit, he will be required to do so at the suit of the

vendee, even though he had no title at the time of making the agreement. The same principle will apply in favor of the licensee in a suit to enjoin a revocation of an executed license: Washburn, Easements & Servitudes (2 ed.) says:

"But the ordinary doctrine of estoppel by deed applies in case of a grant of an easement, so that, if a person without title profess to convey an estate, or to grant an easement, his conveyance operates by way of estoppel, if at a subsequent period he acquires the fee, and the subsequently acquired estate is bound thereby, or, as it is termed, the newly acquired estate feeds the estoppel."

The petition is denied.

AFFIRMED: REHEARING DENIED.