Argued October 20, affirmed November 22, 1921.

# HEISLEY ET AL. *v.* EASTMAN ET AL.

(201 Pac. 872.)

**Waters and Watercourses — Purchaser With Notice cannot Revoke License if Vendor Could not.**

1. Where a grantee had notice of oral permission by the grantor to a third person to lay a drain across the property, the grantee could not revoke such permission if, in the same circumstances, the grantor could not.

**Waters and Watercourses—License to Lay Drain Held Subject to Condition.**

2. Evidence *held* to show that an oral license from an owner of land to lay a drain across the land was on condition that the drain should be so maintained as not to interfere with any use which the owner or his assigns might make of the land.

**Waters and Watercourses—Evidence Held not to Show Violation of Condition of License.**

3. Evidence *held* not to show that plaintiffs, who had a license from defendant's grantor to maintain a drain on condition that it should be so maintained as not to interfere with the use of the property, refused to lower the drain, but to show that they were willing to lower the drain and so maintain it as not to interfere with defendant's foundry.

**Waters and Watercourses—Owner Held Liable for Damages from Plugging Drain.**

4. Where plaintiffs, having a license to maintain a drain across defendant's property, did not violate the condition of the license, but plaintiffs removed part of the tile and plugged up the drain, causing water to back into plaintiff's basement, they were liable for the damages thereby caused unless the license was revocable.

**Waters and Watercourses—Revocable License may be Revoked Notwithstanding Licensee's Expenditures.**

5. If permission from a land owner to maintain a drain across the land amounted only to a revocable license, a subsequent owner of the land had the right to revoke the license, though the licensees had not violated its conditions, and though they had acted on the license and expended a large sum of money for improvements, the

5. On revocability of license to maintain burden on land after licensee has incurred expenses in reliance thereon, see notes in 31 Am. St. Rep. 712; 7 Ann. Cas. 706; 13 Ann. Cas. 843; Ann. Cas. 1913A, 74; Ann. Cas. 1914C. 920; 49 L. R. A. 497; 19 L. R. A. (N. S.) 700; 25 L. R. A. (N. S.) 727.

On effect of incurrence of expenses upon parol license to drain water on to one's property, see note in 6 L. R. A. (N. S.) 154.

value of which would be materially lessened if the right of drainage was terminated.

**Waters and Watercourses—Irrevocable License not Subject to Termination.**

6. If a license to maintain a drain across land was an irrevocable license, the right could not be terminated without the licensee's consent, so long as they exercised their right of drainage in conformity with the permission granted them.

**Licenses—Passive Acquiescence in Improvements Does not Create Irrevocable License.**

7. Passive acquiescence in the expenditure of large sums of money and the making of valuable improvements is not enough to create an irrevocable license.

**Waters and Watercourses—Express Gratuitous Permission Sufficient to Create Irrevocable License.**

8. An express gratuitous oral permission to maintain a drain across land is sufficient to create an irrevocable license by way of equitable estoppel, when acted upon by the making of valuable improvements which would be lost or materially impaired by the termination of the license, though unaccompanied by the accrual of any benefit to the licensor or participation by him in the making of the improvements.

**Waters and Watercourses—Complaint Held to Support Decree on Theory of Irrevocable License by Way of Estoppel.**

9. In a suit to enjoin interference with a drain laid across defendant's land, a complaint, alleging that defendant's grantor gave plaintiffs a perpetual right of way, and that in accordance with the agreement they laid the drain, *held* sufficient to support a decree on the theory of an irrevocable license amounting to an easement by way of equitable estoppel.

**Waters and Watercourses—Licensee Held Bound to Lower Drain, but Entitled to Enter on Property for That Purpose.**

10. Where a license to maintain a drain across another's land was on condition that the drain should be so maintained as not to interfere with any use of the land, the licensees were bound to lower the drain to avoid interference with the use of a foundry on the land subject to the license, or else forfeit their right to maintain the drain, but in order to lower it were entitled to enter upon the property.

From Marion: GEORGE G. BINGHAM, Judge.

Department 1.

This suit was brought by O. F. Heisley and his wife, S. Etta Heisley, against L. C. Eastman, C. J. Johnson and the latter's wife, Edna L. Johnson, for

damages and to enjoin the defendants from interfering with a drain laid across land now owned by Eastman and now occupied by the Johnsons as tenants. A trial resulted in a decree enjoining the defendants from interfering with the drain, awarding the plaintiffs $190 as damages on account of past interference with the drain, and permitting the plaintiffs to enter upon the land owned by Eastman in order to repair the drain and to lower it if necessary "to make it of its former efficiency, not exceeding two feet below the basement floor."

The plaintiffs own and maintain a hospital in Silverton. Fisk Street, which extends north and south, is adjacent to and east of the hospital. East of Fisk Street is lot 12; and adjoining lot 12 on the east is Silver Creek. There is a tile drain embedded in the ground and extending from the basement to the hospital easterly across Fisk Street, thence across lot 12 to Silver Creek. This tile drain is between two and three hundred feet in length. Eastman now owns, and since March 6, 1920, has owned, approximately the east half of lot 12 while the remainder or west half of lot 12 is now owned by J. M. Brown. On January 3, 1921, the drain was plugged up at a point on the Eastman premises; and upon the refusal of the defendants to permit the plaintiffs to remove the plug and repair the drain, the plaintiffs began this suit.

In substance the plaintiffs allege in their complaint that the defendants maliciously broke the drain and stopped the flow of water causing the basement of the hospital to be flooded and the fires in the furnace to be extinguished to the damage of the plaintiffs; that the defendants forcibly prevented the plaintiffs from removing the obstructions placed by them in

the drain and that they will continue to do so unless restrained by the court. The complaint concludes with a prayer for a decree commanding the defendants to allow the plaintiffs to enter upon the Eastman premises and restore the drain to its former condition and enjoining the defendants from interfering with the drain and allowing the plaintiffs damages.

Eastman filed a separate answer in which he avers that Brown gave to the plaintiffs, without limitation of time, oral permission to lay through lot 12 a tile drain leading from the hospital to Silver Creek; that the permission was given by Brown without the payment of any consideration but with the express agreement that the drain should be so laid "and from time to time maintained that the same and the use thereof, should never in any manner, interfere with any use which the said licensor (Brown) and his assigns should desire to put said property"; that thereafter Brown deeded approximately the east half of lot 12 to Eastman; that Eastman constructed a foundry on the premises purchased by him; that in order to enable Eastman to use the premises for a foundry it was necessary that the drain be lowered; that Eastman requested the plaintiffs to lower the drain but they refused to do so; that thereafter during the winter season of 1920 the plaintiffs collected and discharged large quantities of water through the drain and upon the Eastman premises weakening the building and destroying parts of it, and flooding the floor of the foundry to the damage of the tenants and Eastman; that the plaintiffs refused to take steps to prevent the flooding although they were fully aware of existing conditions; that on account of the alleged flooding of the premises and the refusal of the plain-

tiffs to remedy conditions and their alleged violation of the condition attaching to the license, Eastman on September 24, 1920, by notice in writing terminated the license to maintain the drain across his premises. Eastman concludes his answer with a prayer for a decree enjoining plaintiffs from discharging water upon his premises and for damages caused by flood, ing the foundry.

The Johnsons answered by alleging that they are partners engaged in the foundry business under the name of Silverton Foundry Company and that since May 1, 1920, they have been in possession of the Eastman premises and

"have been and are now operating and conducting on said premises an iron and brass foundry and a moulding and pattern-shop."

The Johnsons aver that during the months of November and December in 1920 and the month of January, 1921, the plaintiffs collected and discharged large quantities of water in the foundry and flooded the floor to their damage. The Johnsons concluded their answer with a prayer for a decree enjoining the plaintiffs from discharging water upon the foundry premises and for damages.

The allegations in the two answers, relied upon by the defendants for affirmative relief, were denied by the plaintiffs.                                    AFFIRMED.

For appellants there was a brief and oral arguments by *Mr. John H. McNary* and *Mr. Custer E. Ross.*

For respondents there was a brief and oral arguments by *Mr. L. J. Adams* and *Mr. L. H. McMahan.*

HARRIS, J.—The plaintiffs purchased their land about five years ago. There was a building on the premises at the time of the purchase and as we understand the record the plaintiffs began to use the building as a hospital soon after acquiring the property. In about December, 1918, or January, 1919, the plaintiffs concluded to enlarge the hospital by digging a basement and adding seventeen rooms and four large porches. When the plaintiffs began the work of excavation for the basement they at once discovered that water would accumulate in any basement that might be dug and that some provision for drainage must be made or else the basement when dug would be useless. With water in the basement it would be impossible to keep fire in any furnace that might be installed, or to make any other use of the basement; and so the plaintiffs immediately looked about for a way over which to lay a drain to Silver Creek. The plaintiffs sought permission from one person who apparently did not wish to allow the laying of a drain on his premises, and thereupon the plaintiffs requested Brown to permit a drain to be laid across lot 12. At that time, probably January, 1919, Brown owned the whole of lot 12. Brown granted permission, and thereupon the plaintiffs laid a 4-inch tile drain from their premises across Fisk Street and thence across lot 12 to Silver Creek. The basement was then excavated, a furnace was installed for the purpose of heating the hospital, and the building was enlarged in conformity with the original plans. The line of 4-inch tile which extended from the basement to Silver Creek efficiently drained the basement, and, except on one occasion when a stick of wood entered and became fastened

in the drain, the basement was kept free from water until January 3, 1921.

On March 6, 1920, Brown sold approximately the east half of lot 12 to Eastman. Brown informed Eastman of the existence of the drain and advised him of the agreement concerning the maintenance of it, and hence Eastman cannot revoke the permission granted to the plaintiffs if in the same circumstances Brown could not: *Shaw* v. *Proffitt,* 57 Or. 192, 217 (109 Pac. 584, 110 Pac. 1092, Ann. Cas. 1913A, 63). On about March 19, 1920, Eastman began the construction of the foundry building on the land purchased by him; and on about May 1, 1920, the defendants C. J. Johnson and his then partner, Felice, took possession of the premises pursuant to a verbal agreement of lease made with Eastman. In July, 1920, Felice sold his interest to C. J. Johnson, and since that time the Johnsons have operated the foundry.

When the foundry was built the drain had, of course, been already laid in a ditch dug for it and then covered over with earth. The drain was laid along the south side of lot 12 until a point near the east end of the lot was reached, and there the line of tile diverges slightly from the south side of the lot. O. F. Heisley explains this departure by saying that—

"Mr. Brown stated that I could keep to the southern portion and I did, until I got down to the other end of the lot, and there was so many bushes there I got permission to go around those bushes. Being as they never expected to build on that end we did not keep strictly to the south and next to the creek, but excepting as to the bushes we kept to the south end as he requested."

The east end of lot 12 inclines towards the creek. The foundry was built over the drain, so that the drain enters the foundry near the southwest corner of the building and passes out beneath the east side of the building. When the ground was prepared for the foundry it was necessary to remove earth from the west side of the area upon which the building was to be placed and to fill in the east side of such area in order to secure a level surface; and this resulted in putting the drain deeper beneath the floor on the east side of the building and bringing it nearer the surface of the floor at the southwest corner at the point where the tile enters beneath the building. The foundry floor is of earth as no other kind of floor is suitable.

According to one witness the floor is slightly lower near the southwest corner of the building than elsewhere. The top of the drain is between two and four inches from the surface of the floor near the southwest corner; and according to one witness this is the condition for about three feet along the drain, while, according to another witness, the depth of the floor covering the drain is "not over two inches" for a distance of "six or eight feet, probably ten." At some time between May 1 and July, 1920, Felice did some work inside the foundry and near the southwest corner of the building with a view of installing a brass furnace. C. J. Johnson testified that after he and Felice took possession of the foundry Felice

"started work to construct a brass furnace and in excavating for it he came on this pipe with a pick and made a hole in the pipe. It is about two inches below the floor there. * * He bent a piece of tin lid over the hole and put earth over the top."

This break in the tile caused by the pick in the hands of Felice was "in the southwest corner of the building."

1. It is admitted by all parties that Brown gave the plaintiffs permission to lay a drain across lot 12; and it is also admitted that no time limit was placed upon the right of the plaintiffs to maintain the drain. In other words, Brown understood that he was giving to the Heisleys, and they understood that they were receiving the right perpetually to maintain the drain across lot 12.

2. It is contended, however, by the defendants that permission to maintain the drain was upon the condition that the plaintiffs should so maintain it as not to interfere with any use which Brown or his assigns might wish to make of the land; that the plaintiffs violated this condition imposed by Brown; and that therefore the plaintiffs forfeited the right to maintain the drain. The plaintiffs say that when Brown granted permission to lay the drain nothing was said about the location of the drain or the manner in which it should be maintained except that it should be laid along the south side of the lot. The plaintiffs also say that even though it is held that permission to lay the drain was given by Brown upon the condition alleged in the answer, the condition has not been violated by them and that therefore the right to maintain the drain cannot be revoked.

Brown testified—

"I granted them the privilege of laying a drain pipe through lot No. 12 * * so long as he was to keep it in condition so it would not interfere with the surface use of the property, or the use of the owner, whatever you may call it. * * I gave him the privilege of going through there."

Brown also testified that it was his understanding that Heisley could

"stay * * as long as he maintained it and did it without interference of the property; that he had the right to let it drain through there, but whenever he didn't why then that terminated. * * My understand-ing was that could be maintained there perpetually as long as it did not interfere with the property. That was the essence of the whole thing; it must not interfere with the property."

Our conclusion is that by the clear weight of the evidence the permission given by Brown was upon the condition as stated by him. There were no build-ings on the lot at the time permission was granted; but that the future construction of buildings was con-sidered is made evident by the fact that the drain was placed along the south line so that interference with future building would be avoided as much as possible. Brown was not paid for the privilege, and it is not likely that he would have granted such a privilege gratuitously without protecting himself by an agreement that the drain be so maintained as not to interfere with the future use of the lot. Brown was called by the plaintiffs as their witness, and hence they have vouched for his credibility. It is a signifi-cant fact, too, that according to O. F. Heisley's own testimony the plaintiffs were willing to lower the drain or to change it not only when the foundry was in course of construction but also on December 12, 1920, as well as subsequently; and this avowed will-ingness to lower or alter the drain is strong evidence of a recognition by the plaintiffs of a duty on their part to lower the drain or alter its location if neces-sary to avoid interference with Eastman's use of his own property.

3. Having concluded that the right of maintenance is conditional, we now inquire whether the condition has been violated. Eastman says that on March 19, 1920, he addressed a letter to O. F. Heisley informing the latter that Eastman would "at once" begin the construction of a foundry and requesting Heisley to lower the drain so that "it will be at least two feet below the finished floor of the foundry." Heisley says that he never received the letter, Eastman claims that a few days afterwards he saw Heisley and that when he verbally requested Heisley to lower the drain the latter refused. Heisley claims that he did not refuse to lower the drain. The evidence is in hopeless conflict; but we do not think that the evidence warrants us in finding that the plaintiffs refused to lower the drain. O. F. Heisley says that Eastman requested him to "see the contractor" and that if the drain "was in his way, I should lower it"; that he did see the contractor and that the latter said, "It is not in the way and you won't have to lower it." Arnett, the contractor, was not called as a witness, and it is fair to assume that if Heisley did not have a conversation with Arnett as related by him the defendants would have called Arnett to contradict the testimony of Heisley. Arnett was not called as a witness. Nor can we overlook the fact that Eastman said nothing more to Heisley about the drain and made no complaint whatever until December 12, 1920. Nor can it be forgotten that when Felice broke the drain with his pick he immediately repaired the break with some tin and then covered it with earth, and neither the tenants nor the landlord made any complaint to Heisley or demanded that the drain be lowered or removed or discontinued. There is no evidence in the record indicating that Eastman or his

tenants said anything more to the plaintiffs about the location or condition of the drain until December 12, 1920.

On a Sunday in December, 1920, Eastman had occasion to enter the foundry and upon doing so found that water was being discharged from the drain on to the floor. Eastman says that December 19th was the date, but the plaintiffs and another witness say that December 12th was the date. At any rate, on this occasion Eastman found water discharging from the drain at a point near the southwest corner of the foundry, and we think the evidence fully warrants the conclusion that the point of discharge was the place where Felice had broken the tile with his pick; and we also think the evidence supports the inference that the break made by Felice was the proximate cause of the water appearing on the foundry floor on December 12, 1920. When testifying as a witness in opposition to the application for a preliminary injunction Eastman stated: ''The water was oozing out there [the place where Felice broke the tile].'' Eastman further testified at the trial that the tile ''was broken when I went over to it.'' Eastman enlarged the break and took out some of the tile and with a sack plugged up one end of the break so as to stop the flow of water from the hospital but left part of the break open so that the water could be drained out of the foundry and into Silver Creek. Eastman says that there was an obstruction between the break in the tile and the creek; that he cleared the drain of the obstruction with a rod and a wire; and that he ''got something out of it.'' According to the testimony of Eastman, after the drain was cleared of the obstruction the floor was soon freed from the water on it.

Eastman notified the plaintiffs by telephone that the drain was flooding the foundry floor. O. F. Heisley at once went to the foundry and upon his arrival offered to lower the drain. According to the testimony of Fred Peek,

"Heisley asked him [Eastman] if he could lower the tile, and he said he would be willing to put workmen in there next morning and lower the tile as deep as he said, so deep enough that it would be for all times out of the way, if he would allow him to do it. Mr. Eastman said he could not say because he would have to see Mr. Johnson first."

The plug was permitted to remain in the tile for only a short time, and was removed before the water backed up and accumulated in the basement of the hospital.

The plaintiffs did not lower the drain for the reason that they were not permitted to enter the foundry. Under date of December 20, 1920, Eastman addressed a letter to O. F. Heisley saying:

"After having considered your proposition of running a new drain pipe across the foundry floor I would rather not have it there at all but should you prefer to construct it in a manner suitable to Mr. Johnson I will sell you a right of way across the property for $100. If it should not be acceptable to you, please discontinue before January 1, 1921, the use of my property for your drainage."

On December 24, 1920, Eastman sent O. F. Heisley a letter notifying the latter that "I * * do hereby terminate your right to use" the drain. Notwithstanding the letter of December 24th the water continued to run through the drain until January 3, 1921.

C. J. Johnson plugged up the drain on January 3, 1921, because he says the foundry floor was being flooded with water from the drain. Plugging the

drain caused water to accumulate in the basement of the hospital to a depth of over twenty inches. The fire in the furnace was extinguished. The plaintiffs were obliged to purchase and use oil-stoves and another kind of stove in the hospital. There were patients confined to their beds in the hospital. The rooms could not be kept comfortable with the stoves. This condition produced much annoyance and some distress. O. F. Heisley went to the foundry and, according to the testimony of a disinterested witness, he "called Mr. Johnson before him and told him he was willing to open up the drain, but Mr. Eastman would not let him." The plaintiffs were unable to use the furnace in the basement until about January 14, 1921. The defendants kept the drain plugged up and refused to permit the plaintiffs to enter upon the premises to repair or lower the drain. The plaintiffs then uncovered the drain at a point immediately west of the foundry, and the tile was broken and the water there discharged from the drain with the result that the water so discharged damaged the foundry. If, however, the defendants had permitted the plaintiffs to repair the drain, no damages would have been suffered by them. The plaintiffs advised the defendants that it would be necessary to discharge the water from the drain west of the foundry unless the plaintiffs were permitted to enter upon the Eastman premises and repair the drain.

The plaintiffs began this suit about or soon after January 14, 1921, and upon their application a preliminary injunction was granted restraining the defendants from interfering with the drain. Since the issuance of the preliminary injunction, so far as is disclosed by the record, the basement has been free from water and the foundry has been dry. O. F.

Heisley admits that one night during a telephonic conversation he "told them" that he would not lower the drain; but he further said that—

"the next day I went down and seen them, and we partly made arrangements to lower the drain and run it over to another part of the foundry and put in a couple of elbows."

We infer that this telephonic conversation occurred at some time between December 12th and December 20th when all parties were apparently much embittered. We think, however, that the evidence shows that the plaintiffs were willing to lower the drain when the foundry was constructed and also on December 12, 1920, and on January 3, 1921.

4–7. Having concluded, as we have, that the permission given by Brown was granted on condition that the drain be so maintained as not to interfere with any use which Brown or his assigns might make of lot 12, Eastman was entitled to revoke the right to maintain the drain across his premises if the plaintiffs violated the condition upon which their right was granted and held. Having concluded, however, as we have, that the plaintiffs did not violate the condition of their right of drainage but that they were willing to lower the drain and so maintain it as not to interfere with the foundry, it follows that the defendants must respond in damages for the loss caused by water in the hospital basement, unless it can be said that the permission granted by Brown did not constitute an irrevocable license. If the permission granted by Brown amounted to no more than a revocable license, although acted upon and followed by the expenditure of a large sum of money for improvements the value of which will be materially lessened if the right of drainage is terminated, then Eastman

had the right to revoke the license even though the plaintiffs did not violate the condition upon which the license was given. If, on the other hand, the facts produced an irrevocable license, the right acquired by the plaintiffs cannot be terminated without their consent so long as they exercise their right of drainage in conformity with the permission granted them. Although it was once ruled that passive acquiescence in the expenditure of large sums of money and the making of valuable improvements produced an implied license (*Curtis* v. *La Grande Water Co.,* 20 Or. 34 (23 Pac. 808, 25 Pac. 378, 10 L. R. A. 484), this rule was later repudiated, and it is now settled that passive acquiescence in the making of improvements is not enough to create an irrevocable license: *Ewing* v. *Rhea,* 37 Or. 583, 587 (62 Pac. 790, 82 Am. St. Rep. 783, 52 L. R. A. 140). In the instant case there was an express permission, and, therefore, if the other elements necessary to constitute an irrevocable license are present, then the plaintiffs have a right which is revocable only when they fail to observe the condition upon which the right was granted.

8. But it is argued that an oral, gratuitous permission, although followed by the making of substantial improvements upon the faith of such permission, cannot result in an irrevocable license unless it is also shown: (1) That a consideration was paid to the licensor; or (2) that a benefit accrued or does accrue to the licensor from the exercise of the license; or (3) that the licensor participated with the licensee in a common enterprise in making the improvement. The defendants take the position that a mere naked although express permission to allow a drain even though acted upon by the making of valuable improvements cannot produce an irrevocable license. No con-

sideration was paid to Brown; nor did he participate in laying the drain. Brown testified that the pipe "drained the other part of the lot, if there was any surface water it would carry it away there too"; and yet he also testified that it did not make any difference to him "whether the part of the lot was drained or not so far as" he was not using it. Possibly this benefit in the circumstances found here would be sufficient to bring the instant case within that class of precedents which hold that an accruing benefit is sufficient, as in *McPhee* v. *Kelsey,* 44 Or. 193, 200 (74 Pac. 401, 75 Pac. 713); *Sumpter Ry. Co.* v. *Gardner,* 49 Or. 412, 416 (90 Pac. 499); *Shaw* v. *Proffitt,* 57 Or. 192, 204 (109 Pac. 642, 110 Pac. 1092, Ann. Cas. 1913A, 63); and yet we cannot ignore the fact that neither Brown nor Heisley had in mind any notion of a benefit to lot 12 when the permission was granted. Moreover, we do not understand that Brown or the Heisleys contemplated that the latter were obliged to lay or maintain an "open" tile drain. Indeed, we infer from the record that it would have been entirely satisfactory to Brown if the plaintiffs had laid a drain made of iron pipe, and in that event the drain would not and could not benefit any part of lot 12. Furthermore, if subsequently it should become necessary, in order to comply with the conditions attached to the right of drainage, to remove the open tile and lay iron or other pipe impervious to water no benefit could accrue to lot 12. We therefore deem it appropriate to ascertain whether a naked express and gratuitous permission is enough when executed to create an irrevocable license.

The authorities are in hopeless and irreconcilable conflict upon the question as to whether an oral license becomes irrevocable when acted upon by the

making of valuable improvements which would be lost or materially impaired if the license should be terminated: See note in 31 Am. St. Rep. 712. Stated broadly, it may be said that the authorities can be divided into two classes: One holding that an oral license is revocable at the will of the licensor regardless of the expenditures made by the licensee; and the other holding that such a license may become irrevocable if executed. Unquestionably a majority of the courts have ruled that an oral gratuitous license is revocable, on the theory that to decide otherwise is to override the statute of frauds. The precedents forming the other or minority class proceed upon different theories; some going upon the ground that when the licensee expends large sums of money in making an improvement the license becomes executed so that what was at its inception a license is ultimately transformed into a grant; and others going on the ground of equitable estoppel and holding that a court of equity will not permit the licensor to cloak himself with the statute of frauds and under its cover perpetrate a fraud upon the licensee by revoking the license upon the faith of which the licensee has made valuable improvements which he would not have made without such license: 17 R. C. L. 579.

In the final analysis the doctrine of equitable estoppel furnishes the foundation for probably the larger portion of the cases belonging to the minority class: *Stoner* v. *Zucker,* 148 Cal. 516 (83 Pac. 808, 113 Am. St. Rep. 301, 7 Ann. Cas. 706); *Gyra* v. *Windler,* 40 Colo. 366 (91 Pac. 36, 13 Ann. Cas. 843); 25 Cyc. 646; 1 Williston on Contracts, 311. This jurisdiction must, because of many prior adjudications, be placed in the second or minority class of cases; and here as in most other jurisdictions belonging to the minority

class, the doctrine of equitable estoppel is recognized as the basis for holding an oral license to be irrevocable: *Curtis* v. *La Grande Water Co.,* 20 Or. 34, 44 (23 Pac. 808, 810, 25 Pac. 378, 10 L. R. A. 484); *McBroom* v. *Thompson,* 25 Or. 559, 566 (37 Pac. 57, 42 Am. St. Rep. 806); *Shaw* v. *Proffitt,* 57 Or. 192, 212 (109 Pac. 584, 110 Pac. 1092, Ann. Cas. 1913A, 63); *Kelsey* v. *Bertram,* 63 Or. 563, 565 (127 Pac. 777).

In *Fraser* v. *Portland,* 81 Or. 92, 96 (158 Pac. 514, 9 A. L. R. 614), we directed attention to the fact that some of our precedents appeared to give support to the doctrine that an express oral permission, if acted upon, would be sufficient to create an irrevocable license, but that other precedents contained language indicating the necessity of the payment of a consideration or the accrual of a benefit to the licensor. Neither the payment of a consideration nor the accrual of a benefit to the licensor nor participation by the licensor in the making of improvements meets the requirements of the statute of frauds where land is involved; for the presence of either one of these three elements even though combined with the fact that, acting upon the faith of an express oral permission, valuable improvements have been made, does not enable the licensee to say that he has met the requirements of the statute of frauds, but it does enable the licensee to call upon a court of equity to say to the licensor: "You are estopped to perpetuate a fraud through the aid of the statute of frauds." It must be conceded that in this jurisdiction participation by the licensor in a common enterprise may, when combined with other requisite elements, produce an irrevocable license amounting substantially to an easement. A gratuitous oral permission standing alone

may be just as influential upon the conduct of the licensee as an express permission plus participation by the licensor. In many instances the fact that a consideration is paid or the fact that a benefit accrues to the licensor or the fact that the licensor participated in making the improvements may of itself furnish all the more reason for applying the doctrine of equitable estoppel; but so long as it is held that participation by the licensor is sufficient to work an estoppel, it cannot be logically or consistently held that an express gratuitous permission, although unaccompanied by participation or the payment of a consideration or the accrual of a benefit to the licensor, is not enough to create an equitable estoppel. Nothing that was said in *Curtis* v. *La Grande Water Co.,* 20 Or. 34 (23 Pac. 808, 25 Pac. 378, 10 L. R. A. 484), was subsequently overruled, except the holding concerning passive acquiescence. In not one of the precedents cited in *Fraser* v. *Portland,* 81 Or. 92 (158 Pac. 514, 9 A. L. R. 614), was it necessary for the court to decide whether an express gratuitous permission was insufficient to produce an irrevocable license, for every one of those cases dealt with a situation where a consideration was paid to or received by the licensor, or a benefit accrued to him, or he participated, or he did nothing more than passively to acquiesce; and, indeed, in not one of those precedents was it squarely held that an express oral permission even though executed by the making of valuable improvements could not produce an estoppel. The majority opinion rendered in *Shaw* v. *Proffitt,* 57 Or. 192 (109 Pac. 584, Ann. Cas. 1913A, 63), and especially the opinion rendered on the petition for a rehearing, makes it clear that this court at that time entertained the view that the doctrine announced and applied in

*Curtis* v. *La Grande Water Co.,* 20 Or. 34 (23 Pac. 808, 810, 25 Pac. 378, 10 L. R. A. 484), was still in force except so far as that precedent had declared that passive acquiescence produced an irrevocable license.    The facts in *Ewing* v. *Rhea,* 37 Or. 583 (62 Pac. 790, 82 Am. St. Rep. 783, 52 L. R. A. 140), where the doctrine of passive acquiescence was expressly overruled, and in *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906, 58 Pac. 524), furnished in each instance a pure example of passive acquiescence.    After an examination of our own precedents and a consideration of the conclusions announced in them and after an analysis of the reasons assigned for those conclusions, it is our view that neither the direct payment of a consideration nor the accrual of a benefit to the licensor nor participation by the licensor is a *sine qua non,* although these elements when present either singly or in combination may strengthen the right of a licensee to invoke the aid of a court of equity to prevent the perpetration of a fraud upon him.    An oral and gratuitous permission when acted upon by the expenditure of a considerable sum of money in the construction of valuable improvements, which have been made on the faith of such permission and would not have been made in the absence of such permission and would be either destroyed or materially lessened in value by a revocation of such permission presents a situation making the doctrine of equitable estoppel peculiarly applicable, especially when the limits of that doctrine are measured by the reasoning employed in our own precedents upon the subject of oral licenses; and this conclusion is in harmony with the views expressed by some other courts: *Rerick* v. *Kern,* 14 Serg. & R. (Pa.) 267 (16 Am. Dec. 497); *Stoner* v. *Zucker,* 148 Cal. 516 (83 Pac. 808, 113 Am.

St. Rep. 301, 7 Ann. Cas. 706); 1 Williston on Contracts, 311; 17 R. C. L. 576, 579. In the instant case the plaintiffs made valuable and extensive improvements on the faith of the permission granted by Brown, and if such permission so acted upon is revoked the value of the improvements will be materially impaired. The plaintiffs now have a license amounting in substance to an easement which is revocable only if the plaintiffs refuse to comply with the condition imposed on them by Brown.

9. The defendants contend that the second amended complaint is insufficient to support a decree for the plaintiffs if such decree is based upon the theory of an irrevocable license amounting to an easement. The second amended complaint is not a model pleading, and yet on the authority of *Shaw* v. *Proffit,* 57 Or. 192, 201 (109 Pac. 584, 110 Pac. 1092, Ann. Cas. 1913A., 63), the pleading can be said to be sufficient, especially in the absence of a demurrer interposed in the Circuit Court; for the plaintiffs aver that Brown gave to them a perpetual right of way, and that "in accordance with said agreement" they laid a drain; and these averments taken with the remainder of the pleading are sufficient, although barely sufficient, to sustain the decree.

10. If the drain interferes with the use of the foundry the plaintiffs must lower the drain enough to avoid such interference or else forfeit their right to maintain a drain across Eastman's premises; and in order to lower the drain the plaintiffs are entitled to enter upon the Eastman property. It may be that the parties on one side or the other will desire to have a judicial decision as to whether or not a free and untrammeled use of the foundry floor will require a lowering or alteration of the drain; and in order

that the controversy may be settled as completely as is possible, the cause will be remanded so that the trial court may write at the foot of the decree such directions to the parties as may appear to be proper concerning the question of the immediate lowering or alteration of the drain.   We decline to allow costs to any of the parties in this court.

The decree is affirmed and, for the purposes above explained, the cause is remanded.        AFFIRMED.

BURNETT, C. J., and McBRIDE and BROWN, JJ., concur.