Argued April 8, reversed and dismissed May 11, 1926.

# J. J. McCARTHY *v.* JOHN KIERNAN et al.

### (245 Pac. 727.)

**Licenses—Agreement, Whereby Vendor Granted to Vendee Exclusive Privilege of Mooring House-boats, etc., for Consideration of Forty Per Cent of Rentals, Held "License," not "Lease."**

1. Agreement, whereby vendor granted to vendee the exclusive privilege of mooring house-boats, etc., for consideration of 40 per cent of the rentals obtained, *held* a "license" and not a "lease," as a license is an authority, which does not pass an estate, to do acts on another's land for own benefit.

**Licenses—License Held not Terminated by Conveyance of Property by Licensor to Corporation, in Which Licensor Owned All Stock Except Two Shares.**

2. License for mooring of boats, providing for termination on sale of land, *held* not terminated by a conveyance of the property by the licensor to a corporation, in which licensor owned all of the stock except two shares.

**Licenses—Evidence in Suit to Enjoin Interference With Rights Under License Held Insufficient to Sustain Finding That Licensee of Mooring Privileges, Who Agreed to Conduct Business in Businesslike Way, Conducted Business as Agreed.**

3. Evidence in suit to enjoin interference with rights under license *held* insufficient to sustain finding that licensee of mooring privileges, who agreed to pay licensor 40 per cent of rentals and to conduct business in businesslike way, in default of which agree-. ment might be canceled, had conducted business as agreed.

**Licenses—That Licensor Did not Object Because Licensee of Mooring Privileges Failed to Conduct Business in Businesslike Way as Agreed Does not Enable Licensee to Enjoin Licensor from Interference.**

4. That licensor did not object because licensee of mooring privileges failed to conduct business in businesslike way as agreed does not enable licensee to enjoin licensor from interfering with his rights.

**Licenses—License is Irrevocable When Licensee, in Good Faith Relying on License, Makes Such Valuable and Permanent Improvements That Revocation Would Amount to Fraud.**

5. License is irrevocable when the licensee, in good faith and in reliance on the agreement, makes such valuable and permanent improvments that revocation would amount to fraud.

1.  See 16 R. C. L. 549.
2.  See 17 R. C. L. 586.
5.  See 17 R. C. L. 576.

Licenses—Improvements by Licensee of Mooring Privileges Held not so Valuable and Permanent as to Make License Irrevocable.

6. Improvements by licensee of mooring privileges, which left the property in virtually the same condition as when he took possession, *held* not so valuable and permanent as to make the license irrevocable.

Injunctions, 22 C. J., p. 205, n. 56 New.
Landlord and Tenant, 35 C. J., p. 954, n. 53, 55, 58.
Licenses, 37 C. J., p. 279, n. 76, p. 281, n. 93, 95, p. 292, n. 57, p. 293, n. 62, p. 298, n. 10, 15.

From Multnomah: Louis P. Hewitt, Judge.

Department 2.

Reversed and Dismissed.

For appellant there was a brief over the names of *Mr. T. H. Ward* and *Messrs. Clark, Middleton, Clark & Skulason,* with an oral argument by *Mr. B. G. Skulason.*

For respondent there was a brief over the name of *Mr. John R. Downes,* with an oral argument by *Mr. J. N. Hart.*

BELT, J.—1. Defendants appeal from a decree enjoining them from interfering with plaintiff's rights under and by virtue of a contract as follows:

"This Agreement, made this 11th day of May, 1914, between John Kiernan, Rentor, and J. J. McCarthy, Rentee of Portland, Oregon.
"Witnesseth:
"That the rentor hereby grants to the rentee the exclusive privilege of mooring house-boats, launch-houses, boats and all kinds of water craft along the shores and water frontage of the islands known as Ross and Hard Tack Islands, and small island adjacent in the Willamette River, in the southern part of the City of Portland, Oregon, reserving from this privilege a one-acre tract at the most northerly point

of Ross Island, and also the moorage rights for logs at present enjoyed by the Mill Companies along the easterly side of said Ross Island, from the northerly point thereof to a point opposite and westerly of the northerly point with Hard Tack Island. Nothing in this privilege shall interfere with the rights of rentor to sell all or any part of said islands at any time provided in such case the rentee shall be given ninety days' notice to vacate such part or all so sold or leased.

"In full consideration of this privilege the rentee shall pay each month to the rentor forty (40%) per cent of the rentals collected for such moorage. The book of accounts of the rentee showing the rentals collected shall be open at all times to the inspection of the rentor.

"The rentee shall at all times use his best endeavors to conduct the business in a proper manner satisfactory to the rentor and in an honest and conscientious businesslike way.

"Any breach or failure on the part of the rentee to fulfill his part of this agreement shall give unto the rentor the privilege of cancelling the same."

We agree with respondent that the above instrument is a license and not a lease. A license is an authority to do some particular act or series of acts on the land of another for the benefit of the licensee without passing any estate in the land: *Christensen* v. *Pacific Coast Borax Co.,* 26 Or. 302 (38 Pac. 127); *Stinson* v. *Hardy,* 27 Or. 584 (41 Pac. 116); 37 C. J. 279; 16 R. C. L. 549. The distinction between a license and a lease is well considered in *Christensen* v. *Borax Co., supra.* Also, see *Stinson* v. *Hardy, supra; Klein* v. *Portland,* 106 Or. 686 (213 Pac. 147); 35 C. J. 954.

It is clear from the agreement of the parties it was not intended to pass any estate in this land. Plaintiff was merely given the exclusive privilege to use

the water frontage of these islands for the particular purpose of mooring house-boats, launches and other water craft. The licensor, under the terms of this contract, could use this 'property in any way not inconsistent with the rights of the licensee. It is to be observed that such operative words as "demise," "grant," "lease," and "let," ordinarily found in leases, are not used in the instrument under consideration: *Stinson* v. *Hardy, supra.*

2. There is no merit in the contention of appellant that this agreement terminated in 1917 when the defendant, John Kiernan, conveyed this property to the John Kiernan Corporation, in view of the fact that all of the stock in the corporation was owned by Kiernan, excepting two shares. The rights of plaintiff in this contract could not thus be divested. The license would terminate when the property was either sold or leased, but a *bona fide* sale, within the meaning and spirit of the agreement, must have actually been consummated. The law does not countenance sham and pretense.

3, 4. We next inquire whether plaintiff has complied with all the terms of this contract on his part to be kept and performed. The consideration of this question involves a somewhat detailed recital of the evidence. Upon taking possession of the property, plaintiff was engaged for about a year and a half in ejecting certain alleged undesirable citizens who lived in "shacks" along the eastern shore of Hard Tack Island by virtue of what they claimed to be "squatters' rights." To oust these people from the islands, plaintiff says it was necessary to employ a tug to tow their house-boats down the river and cut them loose. In some instances, plaintiff was obliged to appeal to the courts for relief. The amount expended

in litigation, however, did not exceed the aggregate of $55, including attorney's fees and court costs. It appears from the testimony of plaintiff that the following improvements were made preparatory to the use of this property for moorage purposes: In 1915 ten piling were driven along the shore line of the island for anchorage purposes; five "dead men," at a cost of $55, were buried near the water's edge, from which chains could be extended to houseboats to anchor them on the rear end; and there was also expended for chains and piling collars the sum of $35. During this year there were six or seven house-boats moored, from each of which was obtained a monthly rental of $2.50. During the years 1916 and 1917 no improvements were made, but plaintiff expended the sum of $40 for new cables and chains. In 1918, plaintiff purchased in the City of Portland an old swimming tank for $250, and towed it up the river to Hard Tack Island. However, the tank soon became wrecked and most of it was washed away by high water. No revenue was obtained from this source. Nothing was accomplished in 1919. In 1920, thirty piling were driven and three dolphins were constructed. Plaintiff in that year also constructed 620 feet of board walk on floats, at an estimated cost of $1,200. We think this constitutes a fair statement of expenditures alleged to have been made by plaintiff in improvements, which he estimates amounted in the aggregate to $2,000. Defendants, however, contend that plaintiff's expenditures are greatly exaggerated and, in this view, we concur.

In light of this testimony can it be said that plaintiff was reasonably diligent in the prosecution of this common enterprise? Did he comply with the terms and spirit of this contract? At the time this suit was

commenced, in 1923, the property was virtually in the same condition as when plaintiff took possession of it in 1914. The swimming tank was gone; the sidewalks were washed away, and there remained only about twenty or thirty old piling scattered along the shore line, which, on account of decay, were impracticable to be used for anchorage purposes. The undisputed testimony is that the average life of a pile is eight years. We think it was contemplated by the parties that the licensee should so improve this water frontage property as to make it reasonably adapted for the mooring of house-boats. It was unreasonable to expect owners of house-boats to patronize plaintiff without having furnished city water, lights and boat service to cross the channel. During the nine years which plaintiff carried on this business in a more or less desultory way, the total amount of rentals that Kiernan received was $390. Nothing whatever was done in the way of improvements by plaintiff after 1920, and it is doubtful if any steps would have been taken by him at this time to assert his alleged rights under this contract were it not for the fact that numerous house-boat owners occupying space along the shore of the mainland directly opposite and east of Hard Tack Island were obliged, on the termination of the lease held by Willamette Moorage and Boat Club, to seek moorage space elsewhere.

Defendants attribute the failure of plaintiff to make suitable improvements on the islands to the fact that for several years he had a one-third interest in and was an executive officer of the Willamette Moorage and Boat Club, although at the time suit was commenced he retained only two shares of stock in the company. It may be, since plaintiff secured

much revenue from his interest in the above company, that he was not interested in developing the property on the islands, and that he preferred to keep it from persons who might be competitors.

We are convinced that plaintiff has not shown full compliance with the contract on his part and is, therefore, not entitled to the extraordinary relief sought in this proceeding. The fact that Kiernan did not object to the manner in which plaintiff developed this property does not alter the situation. Regardless of Kiernan's attitude of indifference, it was the duty of plaintiff to comply with his contract.

5. Assuming that plaintiff did not breach his contract, the license is nevertheless revocable unless the licensee has made such valuable and permanent improvements as to invoke the doctrine of equitable estoppel. In this jurisdiction it is well established that a license is irrevocable when the licensee, in good faith and upon reliance of his agreement, makes such valuable and permanent improvements that it would amount to the perpetration of a fraud if the license were revoked: *Heisley* v. *Eastman,* 102 Or. 137 (201 Pac. 872); *Shaw* v. *Proffit,* 57 Or. 192 (109 Pac. 584, 110 Pac. 1092, Ann. Cas. 1913A, 63); *Curtis* v. *La Grande Water Co.,* 20 Or. 34 (23 Pac. 808, 25 Pac. 378, 10 L. R. A. 484).

6. After a careful consideration of the entire transcript of testimony and the photographs received in evidence showing a few scattered piling and a mass of wreckage along the eastern shore of Hard Tack Island, we are firmly convinced that the improvements now on the island and alleged to have been made by plaintiff are neither valuable nor permanent, and that it would not operate as an injustice or the perpetration of a fraud for the licensor to revoke

this license. If plaintiff's testimony is to be believed, he has expended a considerable sum of money in an effort to improve this property, but the fact remains that very little of it has actually inured to the benefit of Kiernan. In revoking the license, the licensor is not depriving the licensee of property of any material value. It has already been destroyed.

If the license were held to be irrevocable, it would rise to the dignity of an easement, and courts are reluctant thus to burden land with such restrictions. Before equity will restrain the revocation of a license of uncertain duration, the evidence must clearly establish that refusal to do so will result in the perpetration of a fraud.

It follows that the decree of the lower court is reversed and the suit is dismissed. Neither party will recover costs and disbursements.

REVERSED AND SUIT DISMISSED.

McBRIDE, C. J., and BEAN and BROWN, JJ., concur.